# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD ARMENTA,<br><br>                              Petitioner,<br><br>                    vs.<br><br>KELLY HARRINGTON, Warden, et al.,<br><br>                              Respondents. | Civil No.    11cv2577-WQH (WMc)<br><br><br>**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS** |

    This Report and Recommendation is submitted to United States District Judge William Q. Hayes pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.

## I.

## FEDERAL PROCEEDINGS

    Richard Armenta (hereinafter "Petitioner"), is a state prisoner proceeding by and through counsel with a Petition for a Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254.  (ECF No. 1.)  Petitioner was convicted by an Imperial County Superior Court jury on August 6, 2008, of first degree murder and conspiracy to commit murder.  (Pet. at 1-2.[1])

---

[1]  When citing to documents filed with the Court's Electronic Case Filing ("ECF") system, the Court will refer to the pages assigned by that system.

The jury returned a true finding on a special circumstance allegation that the murder was carried out to further the activities of a criminal street gang, and Petitioner was sentenced to life in prison without the possibility of parole. (Lodgment No. 3, Clerk's Tr. ["CT"] at 777, 815.) His sentence was reduced to twenty-five years-to-life after the state appellate court found insufficient evidence to support the special circumstance finding. (Lodgment No. 8, People v. Armenta, D054071, slip op. at 57-58 (Cal.App.Ct. Apr. 29, 2010).)

Petitioner alleges here that his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated because: (1) highly prejudicial character evidence was erroneously introduced at trial; (2) trial counsel rendered ineffective assistance by failing to have a handwriting expert testify; (3) appellate counsel rendered ineffective assistance by failing to raise claim five presented here on appeal and by failing to exhaust state court remedies by federalizing Petitioner's juror misconduct claims; (4) the trial court failed to excuse two jurors who spoke to the husband of a key prosecution witness during a recess; (5) trial counsel rendered ineffective assistance in failing to request that a juror who was acquainted with the husband of a key prosecution witness be excused; and (6) the jury heard inadmissible evidence regarding Petitioner's conviction for street terrorism. (Pet. at 10-11; Memorandum of Points and Authorities in Support of Petition ["Pet. Mem."] at 28-36.)

Respondent has filed an Answer to the Petition ("Ans."), along with an incorporated Memorandum of Points and Authorities in support ("Ans. Mem."), and has lodged portions of the state court record. (ECF Nos. 16, 22.) Respondent contends that Petitioner has abandoned claim three, and that federal habeas relief is unavailable with respect to the remaining claims because the adjudication of those claims by the state court involved an objectively reasonable application of clearly established federal law. (Ans. Mem. at 6-22.) Petitioner has filed a Traverse. (ECF No. 23.)

## II.

## STATE PROCEEDINGS

In a two-count second amended information filed in the Imperial County Superior Court on January 11, 2007, Petitioner and his co-defendant Jesus Gastelum were charged with murder

in violation of California Penal Code section 187(a) (count one), and conspiracy to commit murder in violation of Penal Code sections 182(a)(1) and 187(a) (count two), arising from a shooting which took place five and one-half years earlier, in which one person was killed and another wounded. (CT 100-03.) A special circumstance allegation alleged that the defendants intentionally killed the murder victim while actively participating in a criminal street gang in violation of Penal Code section 190.2(a)(22). (CT 104.) The amended information also alleged that the crimes were committed for the benefit of a criminal street gang in violation of Penal Code section 186.22(b)(1)(C); that a principal to the conspiracy personally used a firearm, personally discharged a firearm, and personally discharged a firearm causing great bodily injury and death in violation of Penal Code sections 12022.5(a)(1) and 12022.53(b), (c), (d) & (e)(1); and that Petitioner's co-defendant had suffered a prior serious or violent felony conviction. (CT 104-05.) On December 6, 2007, an Imperial County Grand Jury returned an amended indictment charging Petitioner and Gastelum with conspiracy to commit murder and attempted murder, which included sentence enhancement allegations similar to those contained in the amended information. (CT 388-91.) The cases were consolidated and the attempted murder charge, which involved the wounded victim, was dismissed on statute of limitations grounds. (Lodgment No. 1, Reporter's Tr. ["RT"] at 713-17.)

A joint trial with a single jury began on June 11, 2008. (RT 716.) On August 6, 2008, Petitioner and Gastelum were found guilty on both counts of the amended information, and the jury found true the allegation that Petitioner had intentionally killed the victim to further the activities of a criminal street gang, although they found that allegation not true as to Gastelum. (CT 775-77; RT 3122-23.) On November 5, 2008, Petitioner was sentenced to life in prison without the possibility of parole. (CT 815, 834; RT 3179.) Gastelum was sentenced to twenty-five years-to-life in state prison. (RT 3157.)

On August 3, 2009, Petitioner appealed his conviction, raising claims one, four and six presented in the federal Petition here, along with a claim challenging the jury's special circumstance finding. (Lodgment No. 5.) The appellate court affirmed the conviction in an unpublished opinion in which it denied the claims raised here on the merits, although it granted

relief and remanded with instructions to resentence Petitioner to a term of twenty-five years-to-life after finding insufficient evidence was presented at trial to support the special circumstance finding.  (Lodgment No. 8.)  On June 1, 2010, Petitioner filed a petition for review in the state supreme court raising claims one, four and six presented here.  (Lodgment No. 9.)  On August 11, 2010, the state supreme court summarily denied the petition for review without comment or citation of authority.  (Lodgment No. 10.)  Petitioner filed a habeas petition in the state supreme court on November 3, 2011, raising claims two through six presented here, which the state supreme court summarily denied on April 11, 2012.  (Lodgment Nos. 11-12.)

**III.**

**EVIDENCE ADDUCED AT TRIAL**

*Prosecution case in chief*

Chris Espinoza, a Brawley, California police officer, testified that he was dispatched at 1:14 a.m. on September 16, 2011, to a shooting at a residence on B Street in Brawley.  (RT 784-86.)  Upon arrival he observed Jesse Garcia lying face down on the floor bleeding from a gunshot wound to the forehead.  (RT 787-88.)  A crowd of people were being held at the rear of the house by Sergeant Monita, who had already arrived on the scene, and numerous beer cans were visible indicating to Espinoza that a lot of drinking had been going on.  (RT 792, 798.)

Daniel Villa Castillo, whom the parties refer to as Mr. Villa, testified that he had been convicted of a felony drug offense involving bringing cocaine into the United States from Mexico, for which he had served a federal sentence and been ordered to be deported.  (RT 814-15, 969, 921-23.)  He said he was a member of the Latin Kings gang when he lived in Brawley in 2001, that he knew Petitioner though friends who bought drugs from Petitioner, and that he had personally bought marijuana and methamphetamine from Petitioner.  (RT 815-17.)  Villa said that Petitioner, whose gang moniker was Widget, had admitted in 2001 that he was a member of the Chicali Brasas 13 gang.  (RT 818-19.)  Villa also knew Petitioner's co-defendant Jesus Gastelum, who he knew as Pookie, and said Gastelum often hung out at Petitioner's house in Brawley.  (RT 819-20.)

/ / /

Villa testified that on the night of the shooting he walked to Petitioner's house to buy drugs. (RT 821.) A young woman he assumed was Petitioner's girlfriend answered the door and allowed him in. (RT 905.) Petitioner asked Villa if they could go to the store to buy beer first, but instead they drove past the house on B Street where the shooting took place later that night. (RT 821-24, 906.) There was a party at the house and the people at the party recognized Petitioner's car, a 1997 blue Cougar, and turned to look at them as they drove past. (RT 825, 834.) Petitioner recognized members of a rival gang in front of the house and asked Villa if he would be willing to shoot someone if Petitioner gave him a gun. (RT 826.) Villa said he did not answer Petitioner, and that they returned to Petitioner's house without stopping at the liquor store. (RT 827.)

Villa testified that when they returned to Petitioner's house Petitioner announced to the people in his room, who included Gastelum, Petitioner's brother, and a person Villa did not know but who he thought might have been called Ghost, that members of a rival gang were at the party, and asked if someone would volunteer to do a shooting. (RT 827-28, 833-34, 910, 916.) Gastelum responded by stating that "he was going to do the job for his gang, the Chicali Brasas 13." (RT 828.) Petitioner took a black .38 special revolver with a barrel six or seven inches long from its hiding place inside a speaker. (RT 829-30.) Gastelum cleaned it, someone else cleaned the bullets, and Petitioner loaded the gun. (Id.) Gastelum put the gun in his belt, and Villa stayed in Petitioner's room as Petitioner and Gastelum drove off together in Petitioner's mother's Toyota Camry. (RT 830-34.)

Villa testified that as he waited in Petitioner's room with Petitioner's brother and the person Villa did not know, they listened to a police scanner. (RT 835.) Villa heard a police officer report a shooting on B Street, and said Petitioner and Gastelum returned two or three minutes later. (RT 836.) When Petitioner and Gastelum returned they appeared very happy; Gastelum said he had gotten out of the car, knocked on the door, and fired at the head of the person who answered while saying "Puto, Chicali Brasas." (RT 837.) Gastelum also said that after he fired the first time he heard something and fired a second time, firing a total of three or four bullets, and thought he had hit someone else. (RT 838, 951, 959.) Gastelum told the group

gathered in Petitioner's room that if anyone said anything about the shooting, the same thing would happen to them.  (RT 839.)  Villa left Petitioner's house without buying drugs, but did not immediately go to the police because he feared for his life and the lives of his family and girlfriend, all of whom lived in Brawley at the time.  (RT 840.)

Villa testified that he decided to contact the authorities while he was in federal prison in 2003, after his family had moved away from Brawley, because he wanted to do the right thing. (RT 841-42.)  He said he wrote two letters to the FBI while in prison, one in Spanish and one in English, indicating that he had information regarding the shooting.  (RT 843-46.)  As discussed below, Petitioner contends in claim two of the instant Petition that his trial counsel retained a handwriting expert who was willing to testify that Villa had not written the letters, but that they were written by Special Agent Jose Soto of the California Department of Justice, and that his trial counsel was ineffective for failing to call the expert to testify and failing to argue to the jury that the government had manufactured the letters in order to put pressure on witnesses to solve a cold case.  (Pet. at 10.)  Villa told the jury that the only benefit he received for testifying was a temporary stay of deportation so that he could testify at trial, and that he was currently in the witness protection program and was receiving $800 each month from the District Attorney's office.  (RT 849, 856.)  Villa informed the court that while he was on the witness stand, outside the presence of the judge and jury, Gastelum had threatened him by saying: "I'm going to kill you, puto," while hitting his fist into his hand.  (RT 894-95, 981-82.)

Dinah Rodriguez, the mother of Jesse Garcia, testified that she had been sitting in the courtroom with her cousin and they both observed Gastelum hitting his fist into his open palm while looking at Daniel Villa, who was on the witness stand at the time.  (RT 1731-36.)  Karla Davis, currently an Assistant United States Attorney but formerly the Deputy District Attorney and the prosecutor assigned to this case, testified that she was in the courtroom when Villa was testifying and that at one point Dinah Rodriguez frantically turned her attention to Gastelum. (RT 1738-41.)  Davis said Villa told her that Gastelum had threatened him by putting his fists together as though it was a gun, and that he said something like: "I'm going to kill you, puto." (RT 1741-43.)

Joseph Somenek, a special agent with the California Department of Justice, testified that he was involved in the investigation of the death of Jesse Garcia, and that Special Agent Jose Soto was his supervisor. (RT 1016-17.) Somenek arranged two live lineups for Daniel Villa at the Imperial County Jail on August 31, 2006. (RT 1017-18.) Villa picked Petitioner and Gastelum out of the lineups. (RT 1023-26.)

Israel Salazar, whose gang moniker is Chivo, testified that he received no promises or consideration for his testimony, other than "complete immunity," and that he had a prior conviction for misdemeanor terrorist threats against his girlfriend. (RT 1072-75, 1127.) Salazar stated that he had been a member of the Chicali Brasas gang in Brawley since he was 14 years old, and was active with the gang in 2001, but left the gang after he testified at the preliminary hearing in this case. (RT 1073, 1075.) He said he was testifying because he wanted to change his life. (Id.) Salazar had known Petitioner, who was also in the Chicali Brasas gang and was nicknamed Widget, since they were in sixth grade together, and said he and Petitioner were good friends and had spent a lot of time together. (RT 1075-77.) Salazar said that Petitioner was not exactly a leader in the gang, but that Petitioner was followed by others and his house was a gang hangout. (RT 1078.) Petitioner had introduced Salazar to Gastelum, who went by the name Pookie and was also an active member of the Chicali Brasas. (RT 1079-80.) Salazar said the Broleno gang was also active in Brawley and did not get along with the Chicali Brasas gang. (RT 1081.)

Salazar testified that Petitioner and his girlfriend Doris came to visit Salazar several hours before the shooting, just after dark. (RT 1192.) Petitioner asked Salazar at that time to accompany him to a Brolenos party to "blast them," meaning to shoot them, and "to go get them slipping," by which he meant catch them off guard. (RT 1082-83, 1136.) Salazar was in the middle of an argument with his girlfriend so he declined to go with Petitioner. (RT 1083-84.) Petitioner told Salazar that he was first going to visit Pete Castellanos, a fellow Chicali Brasas gang member who had been paralyzed as a result of being shot by a Broleno gang member in 1997. (RT 1084-85.) Salazar said that Petitioner had commented in the past that someone had to be paid back for the Castellanos shooting, meaning someone had to be shot. (RT 1085.)

Petitioner came back to Salazar's house a few hours later, by himself, and gave Salazar a gun to hide, a black long-barreled .38 caliber revolver, along with some bullets in a baggie; Petitioner looked scared and told Salazar that "some shit went down on B Street" and someone had gotten shot in the head. (RT 1086-88, 1092-93, 1193.) When Salazar later found out about the shooting he tried to contact Petitioner, but ended up asking a friend to tell Petitioner to pick up his "toy," a word their gang used to refer to guns. (RT 1088.) He later spoke to Petitioner and asked him if he was the one who shot the boy, and Petitioner said: "No. It was Pookie." (RT 1087-88.) Petitioner also told Salazar that the shooting was payback for what had happened to Castellanos. (RT 1088.) Petitioner picked up the gun from Salazar's house about three days later, accompanied by Adrian Cruz Garcia and George Ruiz, both fellow gang members. (RT 1090, 1093.) Petitioner was nervous and scared when he picked up the gun, and asked Salazar to continue hiding it, but Salazar refused. (RT 1090.)

Salazar testified that he made up his mind to assist the police when he read a newspaper article about the shooting. (RT 1195-96.) He voluntarily contacted the police about ten days after the shooting because he had children himself, and thought that it was wrong for "a young kid" who was not involved in gangs to get shot. (RT 1080-82, 1143, 1215.) Salazar said that after he telephoned the police on September 27, 2001, Agent Soto showed up at his house and arrested him for an outstanding traffic citation warrant, and at that time he told Soto and Officer Morena that he knew who did the shooting and who had the gun. (RT 1095-96, 1138-39, 1144.)

Salazar said that in 2006 he was in the Imperial County Jail preparing to go to court on a charge of possession of a screwdriver when he saw Petitioner and Gastelum together in the next room going over paperwork in their criminal case. (RT 1098.) Gastelum and Petitioner had apparently read what Salazar had told the police, and Gastelum asked Salazar to do him a favor and not testify, or tell the judge that his previous statements were false, because "this shit is serious and they are facing life." (RT 1099-1100.) Salazar said that in 2006 he had as a jail cellmate for two to three weeks Francisco Javier Hernandez, also known as Cisco or Cisco Kid, the victim who was shot and wounded during the B Street shooting. (RT 1205.) Salazar said he did not tell Hernandez what he knew about the shooting because Hernandez did not want to

talk about the incident, but said that Hernandez was apparently aware that Salazar was cooperating with the police and that Hernandez called Salazar a rat.  (RT 1206-10.)

Luis Alberto Santoyo testified that he had been given no promises or consideration in exchange for his testimony, and that he had been convicted of felony residential burglary in 2001.  (RT 1237-38.)  He said he was a member of the Chicali Brasas gang for about 11 years, since he was 14 or 15 years old, that his gang name was Bullet, and that Petitioner, or Widget, had been his close friend and fellow gang member.  (RT 1238, 1327, 1337.)  Santoyo testified that Petitioner was a leader in the gang and often planned the gang's activities.  (RT 1240-41.)  He said that Petitioner and Gastelum, who he knew as Pookie, were friends and fellow gang members.  (RT 1242-43.)

Santoyo said he was present at Petitioner's house in April 2005 with Gastelum and Petitioner's brother when Petitioner stated that someone had been speaking with the police about a gun.  (RT 1244, 1276.)  Santoyo thought Petitioner was referring to him, and he denied being the informer.  (RT 1244-45.)  Petitioner told Santoyo that a person named Santo had taken the gun to Mexico.  (RT 1245.)  Santoyo said Petitioner often talked about the shooting, and was happy when he did so, but that Gastelum always stayed quiet.  (RT 1246.)  Petitioner said the motive for the shooting was to get someone back for shooting his friend Pete.  (Id.)  Petitioner told Santoyo that Petitioner, Galstelum and a person named Happy drove by the party, parked, Gastelum got out and "did what he did," returned to the car and they left.  (RT 1247-48.)  Gastelum told Santoyo on one occasion that somebody had approached Gastelum while he was in jail and mentioned that the Jesse Garcia killing was a drive-by shooting, a type of shooting prohibited by imprisoned gang leaders, who are also known as "shot callers," due to the potential of innocent victims being shot, and that Galstelum had corrected the person and said that he had done the shooting and it was not a drive-by.  (RT 1248-50.)

Santoyo said he spoke with the police because he has a little brother and would not want such a thing to happen to him, and that it was not right to kill a young kid like Jesse Garcia who was into church and sports.  (RT 1252.)  He said he met Petitioner in jail in 2006 and that Petitioner asked him to do him a favor and not testify.  (RT 1253.)  He said he also spoke to

Gastelum in jail, and that Gastelum told him that he could not believe what he was doing, that it was wrong, and that he should not testify and should say everything he had already said was a lie.  (RT 1338-39.)  Santoyo said he received a letter from Petitioner dated January 9, 2008, sent from prison in Petitioner's handwriting, which he recognized from previous letters, asking him not to testify, and not to forget they are friends.  (RT 1340-46.)

Francisco Hernandez testified that he had been convicted of felony receipt of stolen property in 2006.  (RT 1366.)  He attended a party on the night of September 15, 2001, at a house on B Street in Brawley.  (RT 1366-67.)  He said he was outside the house when a group of people passed by and words were exchanged.  (RT 1369.)  Later on he was outside when he saw someone walking toward him.  (RT 1372.)  That person, who he identified in court as Gastelum, said "come here" as he approached, and then pulled a gun and opened fire; Hernandez turned to run and was shot in the back.  (RT 1373-75.)  He did not realize he had been shot until he smeared blood on the wall as he hid behind a refrigerator in the house.  (RT 1376-77.)  He then noticed that his friend Jesse Garcia was lying on the floor with blood pouring out of his head like a water fountain.  (RT 1377.)  Hernandez left when the police were called because he had an outstanding arrest warrant.  (RT 1378.)  He went to a house down the block and called Mary Vasquez, his friend's mother, and asked her to pick him up, and was later taken to the hospital.  (RT 1379-80.)  Hernandez said he did not cooperate with the police at the hospital because he was afraid of retaliation, and did not cooperate while he was in jail because he did not want to be known as a snitch.  (RT 1381-84.)  He denied receiving any favors or consideration for his testimony.  (RT 1390.)  Hernandez said Israel Salazar was his cellmate in jail and that Salazar told him that Petitioner had brought the gun to Salazar's house, that Petitioner was scared and panicky, and that Petitioner had dropped the gun off and picked it up later.  (RT 1396-98.)

During a break in Hernandez' testimony, Petitioner's counsel stated that he had observed Mary Vasquez, the next scheduled witness, conversing with two jurors outside the courtroom.  (RT 1528.)  The court held a hearing regarding the incident and determined that the jurors had been approached by Vasquez' husband, who was a casual acquaintance of one of the jurors, that

they had not discussed the case, and that it was a harmless encounter. (RT 1528-34.) The trial judge denied the request by Petitioner's attorney that Ms. Vasquez not be permitted to testify as a sanction for the jurors' failure to follow their admonishment. (RT 1664-67, 1672-75, 1678.) As discussed below, Petitioner contends in claim four of the instant Petition that both jurors should have been excused, in claim five that his trial counsel rendered ineffective assistance in failing to seek dismissal of the juror acquainted with Vasquez' husband, and in claim three that his appellate counsel rendered ineffective assistance in failing to raise claim five on appeal and failing to exhaust state remedies by federalizing the juror bias claim. (Pet. at 10-11.)

Mary Vasquez testified that her sister lives near the house where the shooting took place, and that a few hours before the shooting Vasquez was driving near her sister's house when she saw Petitioner urinating next to a blue Cougar automobile. (RT 1679-83, 1714.) Vasquez, who worked at the local juvenile hall, said her son and nephew are members of the Broleno gang and that she was concerned that Petitioner, who she knew was a member of or associated with the Chicali gang, was in a Broleno neighborhood. (RT 1684-86.) When Vasquez told Petitioner she was worried about his presence in the neighborhood, Petitioner replied: "Don't worry. I'm not doing anything. I just stopped to take a piss." (RT 1687.) She said that later that night, Francisco Hernandez, who hangs out with Vasquez' son, asked for a ride, and she took him from her sister's house to a friend's house. (RT 1689-90.)

Jose Soto, a Special Agent for the California Department of Justice, testified that he supervises agents who are responsible for investigating shootings, homicides, political corruption and other major crimes. (RT 1588.) Soto said he had been working on the Jesse Garcia homicide since September 2001, at the request of the Brawley Police Department, and that he had interviewed most of the witnesses. (RT 1588-89.) Brawley Police Detective Greg Heath informed Soto that Israel Salazar had called the Brawley Police Department on September 18, 2001, stating that he had information regarding the weapon used in a recent shooting. (RT 1589.) Soto learned that Salazar had an outstanding warrant for a traffic violation, so he went to Salazar's house and arrested him. (RT 1589-90.) Soto said that Salazar voluntarily provided information with respect to the shooting before Salazar had asked for or was offered immunity.

(RT 1590-91.)  Soto also interviewed Luis Santoyo, and said that Santoyo did not ask for favors in return for his cooperation, and in fact Santoyo went to prison numerous times after cooperating but Soto never interceded on his behalf.  (RT 1591-92.)  Soto interviewed Daniel Villa, who told him that Juan Baltazar was nicknamed Ghost, and said that Hernandez had picked Gastelum from a photographic lineup as the person who shot him.  (RT 1593, 1601-02.)

Agent Soto testified that he was given an envelope from the Imperial County Jail with Petitioner's name and booking number, addressed to the FBI office in El Centro, California, which contained a handwritten letter signed by Petitioner dated August 26, 2006.  (RT 1893-94, 1942-43.)  The letter read:

> Mr. Soto,
>
> I really need to talk to you soon.  I have information regarding the case I'm going to court.  I can let you know where is the weapon, who is involved in this crime.  There is other people involved in this.  I have been trying to speak with you.  I can let you know exactly what happened beginning to end and other people's involvement.  I wanted to speak to Karla Davis, but I didn't have a lawyer.  My Lawyer is Plourd, Breeze.  Could you please contact him so I could speak with you or Karla Davis.  Thank You.  Richard Armenta [name printed as signatory] I could really help you a lot in this case, the truth, what really happened.

(RT 1944-46.)  Soto said he did not contact Petitioner because Petitioner was represented by counsel.  (RT 1950.)

Jason Rodriguez, a Parole Agent employed by the California Department of Corrections and Rehabilitation, testified that he had previously supervised Petitioner and that Petitioner was documented as a member of the Chicali Brasas 13 gang with a moniker of Widget.  (RT 1647-53.)  Rodriguez photographed Petitioner and documented his tattoos.  (RT 1654.)  The jury was shown a photograph of Petitioner's back on which the word Chicali was tattooed, and his chest on which the word Brasas was tattooed.  (RT 2204-05, 1656-57.)

Michael Bell, a Unit Supervisor with the El Centro Parole Unit, testified that he had supervised Gastelum at one point, that he photographed Gastelum to document his gang tattoos, and that Gastelum admitted to being a member of the Chicali Brasas gang.  (RT 1719-23.)  Dennis Ambrose, Luis Santoyo's parole agent between 2003 and 2006, testified that he had several parole violations and was sent back to prison many times during that time.  (RT 1749-

50.) Ambrose said he was never asked to be lenient with Santoyo. (RT 1750.) Karla Davis also said she did not give Luis Santoyo any leniency on his cases in return for his testimony, and that, quite the contrary, his parole had been violated and he was returned to prison several times since he began cooperating but she never interceded. (RT 1744.)

Perry Juan Monita, a Patrol Sergeant with the Brawley Police Department and the department's gang expert, testified that the two main gangs in Brawley are the Chicali and Broleno. (RT 1789-92.) Monita testified that it was considered odd that Petitioner, whose father was a Broleno, had joined the Chicali gang, and from speaking to Broleno members Monita concluded it was because the Broleno gang did not want Petitioner because he was considered weak. (RT 1795.) Monita considered Petitioner a leader in the Chicali gang, and said that whenever he would be released from jail and return to Brawley "things went crazy" and the "Chicali Brasas got very active again." (RT 1935.) He said that the residence on B Street where the shooting took place was a Broleno hangout in Broleno territory, and that Petitioner's house was a Chicali hangout in Chicali territory. (RT 1797-99.)

Monita testified that Gastelum and his brother were convicted of a gang-related robbery that took place on November 7, 2000, and that the tattoos depicted in the photographs of Petitioner and Gastelum indicate membership in the Brasas clique of the Chicali gang. (RT 1801-13.) Monita saw Pedro Castellanos, an associate of Chicali who was the victim of a gang-related shooting in 1997, with Petitioner on more than one occasion. (RT 1814-15.) Monita opined that the motivation for the shooting at the B Street house could have been in retaliation for the Castellanos shooting or could have been in retaliation for something that happened to Petitioner's brother, but that the murder victim Jesse Garcia was not a gang member. (RT 1835, 1914-15.)

Monita testified that Petitioner and two other Chicali gang members were involved in an incident in October 2001, about a month after the Jesse Garcia murder, in which the victims were Broleno gang members, and that Petitioner had suffered a street terrorism charge as a result. (RT 1822-23.) Although the trial court had sanitized Petitioner's conviction for street terrorism to prevent the jurors from learning it involved a gang-related shooting, Monita inadvertently stated

that the police had responded on that occasion after receiving a call of a shooting, and the jury was admonished to disregard that comment. (RT 1818-22.) As discussed below, Petitioner contends in claim six of the instant Petition that his rights to due process and a fair trial were violated by the admission that he had been convicted of street terrorisim because it was so similar to the charge for which he was being tried, and because the trial court refused to exclude its admission as a sanction for Monlia's comment that it involved a shooting. (Pet. at 11.)

Ruby Garcia testified that she grew up with Gastelum and they were good friends. (RT 1861-62.) She had a conversation with Gastelum, who she knows as Pookie, when she visited him in the county jail in October 2001, which was recorded. (RT 1862-63.) The recording was played for the jury and a transcript is in the record. (RT 1864; Lodgment No. 4, Supp. CT at 1-23.) Garcia told Gastelum during that conversation that someone had tipped the police off that Gastelum had the gun that shot Jesse Garcia, that "they" were saying that Gastelum had pulled the trigger, and that the police had come to Gastelum's house to search for the gun and had found and seized a .357 caliber handgun. (RT 1865-67.) Gastelum responded that the .357 was not the gun used during the shooting on September 16, 2001. (RT 1866-67.) Garcia also testified that a lot of people referred to Petitioner as a drama queen because he "makes scenes." (RT 1868-71.)

Luis Santoyo was recalled and testified that in the letter he had received from Petitioner asking Santoyo not to testify, Petitioner had referenced "Kat," a gang moniker for Carlos Landa. (RT 1873-74, 1887.) Santoyo said that Petitioner had asked Landa to give Santoyo a message that Santoyo should not testify, and that if he did he should lie. (RT 1874-76, 1886.) The People rested. (RT 1951-55.)

*Petitioner's defense case*

Counsel for Petitioner gave his opening statement (RT 1956-76), and called Bianca Garcia as the first defense witness. (RT 1977.) Garcia testified that Israel Salazar is the father of her three children, that they lived together in Brawley from 1994 to 2001, which she described as the worst years of her life, and they never married. (RT 1977-78.) She said that although Petitioner was Salazar's friend, she never liked Petitioner and never allowed Petitioner to come

to her house.  (RT 1981-82.)  She stated that she was recovering from a difficult childbirth around the time of the shooting and was sleeping most nights, and admitted that Petitioner could have come over on the night of the shooting when she was asleep.  (RT 1985-86, 1989.)

Doris Armenta, Petitioner's wife and the mother of his two children, testified that she was dating Petitioner in 2001 while she was attending high school.  (RT 1994, 2013.)  The record reflects that a few questions into her testimony Petitioner made "a run for the back gate" of the courtroom while saying: "Fuck that fool."  (RT 1995.)  The courtroom deputy testified outside the presence of the jury that it appeared Petitioner had rushed the gate and attempted to spit on a member of the public in the courtroom.  (RT 1996.)  Petitioner's counsel indicated that the person Petitioner took umbrage with was Petitioner's wife's boyfriend, who Petitioner's counsel had asked not to come to court.  (Id.)  The trial judge informed the jury that it appeared that Petitioner was upset that his wife had brought her boyfriend to court with her, and that Petitioner would not be present during her remaining testimony.  (RT 2005-06.)

Petitioner's wife testified that on the night of the Jesse Garcia shooting she was in Mexicali, Mexico attending her sister's first birthday party.  (RT 2008.)  Defense counsel played excerpts of a videotape of that party for the jury, which did not have a time or date stamp, but which Mrs. Armenta testified took place around 3:00 or 4:00 in the afternoon.  (RT 2009, 2019.)  She said she called Petitioner at his home at least ten times on the night of the shooting and spoke to him every time, including past midnight.  (RT 2011.)

Gregory Heath, a Brawley Police Detective, testified that he investigated the September 16, 2001, shooting on B Street.  (RT 2022-23.)  He searched Petitioner's residence on September 18, 2001, but found no firearms, ammunition or police scanners.  (RT 2023-24.)  Heath interviewed Petitioner on September 21, 2001, and when asked about his affiliation with the Chicali gang, Petitioner told Heath: "I used to be [a member] in the past."  (RT 2028-29.)

Cecilia Munoz testified that Daniel Villa was her boyfriend in 2001 when she was living in Brawley with her parents.  (RT 2039-41.)  She said Villa supported himself by selling methamphetamine, and that she visited him in jail after he had been arrested for smuggling cocaine over the border.  (RT 2041-45.)

Agent Soto was recalled and testified that when he spoke to Daniel Villa in September 2004, Villa asked for leniency in sentencing and with his immigration status.  (RT 2075-76.) Soto said that the first interview with Francisco Hernandez when he was forthcoming about the shooting was December 6, 2006, and that Soto had applied for arrest warrants for Petitioner and Gastelum on May 2, 2006.  (RT 2077-83.)

Steven Angulo testified that he was a former member of the Chicali gang in Brawley, having left that gang in 2000, that he knew Petitioner, and that Petitioner had left the gang around 2000 after he was married and had children.  (RT 2102-03.)  Angulo said it was a myth that gangs have leaders, and that Petitioner was not a leader of the gang.  (RT 2104.)  He knew Daniel Villa, and said that Villa was never a member of the Chicali gang and had a reputation in the community as a liar.  (RT 2106-08.)  Angulo also said that Luis Santoyo was a neighborhood heroin addict and a Chicali gang member.  (RT 2109.)

Carlos Landa testified that he met Petitioner and Luis Santoyo in jail, but denied that Petitioner had asked him to give Santoyo a message.  (RT 2136-38.)  He admitted that he was known as Kat when he was a gang member.  (RT 2139.)  When asked if he was afraid of Petitioner he answered: "What for?" and the prosecutor then asked him if he had ever told Soto that Petitioner "will kill you if you cross him" and that Petitioner "wouldn't hesitate to shoot someone." (RT 2141-42.)  Landa answered "no" over a defense objection.  (Id.)  As set forth below Petitioner contends in claim one that his rights to due process and a fair trial were violated when the trial court allowed the prosecutor to ask the question.  (Pet. at 10; Pet. Mem. at 26-27.)

Antonio Zamora Fernandez testified that he was divorced from Frances Sepulveda, Petitioner's mother, and that about 7:30 p.m. on the night of the shooting he went to visit her and their children at their residence on I Street in Brawley where Petitioner lived.  (RT 2144-47.) He said Petitioner answered the door when he arrived and that Petitioner remained there until Fernandez left around 9:15 p.m.  (RT 2147-49.)

Lupe Salcido testified that she arrived at Frances Sepulveda's house on September 15, 2001, about 10:00 p.m.; at first she said she stayed about an hour and then said she stayed until about midnight.  (RT 2152-53, 2156.)  When she arrived, Petitioner, Fernandez and two of

Fernandez' children were there, and Petitioner was talking on the telephone.  (RT 2153-55.)  Salcido said she left the house for a few minutes around midnight, but returned and stayed until about 1:00 a.m., and that Petitioner was there the entire time.  (RT 2158.)  She admitted she was friends with Petitioner and called and visited him numerous times while he was incarcerated, which included romantic conversations.  (RT 2162-65.)  She also admitted to having close ties to the Chicali gang for a long time and having been good friends with Petitioner and his family.  (RT 2168-69.)

Frances Sepulveda Valenzuela testified that she is Petitioner's mother and that Petitioner was run over by a car and dragged when he was three years old, and as a result had to undergo a craniotomy.  (RT 2172-73.)  She testified that to her knowledge Petitioner's father never lived in Brawley, and that he was not a gang member when they met in 1976.  (RT 2174.)  She said Petitioner did poorly in school as a result of his head injury, and that his friends stole from him and took advantage of him.  (RT 2175-77.)  He was expelled in the fifth grade and did not return to school, and was often arrested and incarcerated.  (RT 2179-81.)  She said she was home on the evening of September 15, 2001, and to her knowledge Petitioner did not leave the house that evening.  (RT 2181-82.)  She did not know for sure if he left around 2:00 a.m., but did not think so, and thought she would have known if he had.  (Id.)  She called the police earlier that night after a member of the Broleno gang, who had previously shot at her house and against whom she had a restraining order, drove past her house; she said Petitioner was upset that she called the police because he was afraid people would think they were rats.  (RT 2185-86, 2206-07.)

Valenzuela said she was approached by Luis Santoyo in 2008, who told her that his implicating Petitioner in the shooting was payback for Petitioner implicating Santoyo in the killing of Peppy Sandoval.  (RT 2188-90.)  Santoyo approached her again later and apologized, and said that "they are making" him provide evidence against Petitioner.  (RT 2191.)  She said Petitioner got the tattoos of the words Chicali and Brasas on his chest and back after he had left the California Youth Authority.  (RT 2204-06.)

Matthew Pumphrey, Sergeant with the Imperial County Sheriff's Department, testified that he worked at the Imperial County Jail, and on October 23, 2006, was approached by Agents

Soto and Somenek to give a message to Luis Santoyo that his life may be in danger.  (RT 2229-30.)  He said Santoyo was surprised, but because Santoyo was already in protective custody no new security measures were taken.  (RT 2231-32.)

Clark Smith, a medical doctor board certified in psychiatry, testified that he had examined Petitioner, and had reviewed documents relating to prior examinations which indicated that Petitioner had an I.Q. of 57, in order to determine his level of cognitive functioning.  (RT 2270-83.)  Dr. Smith stated that Petitioner lacked the ability to reason abstractly, lacked a normal range of insight and understanding of his current legal situation, has poor short term memory, an inability to plan multistep tasks, and is mildly retarded.  (RT 2294-99.)

Joel Gaytan testified that about 5:00 p.m. on September 15, 2001, he and a group of friends walked past the house on B Street where the shooting took place, noticed a party going on, and briefly spoke to the people there.  (RT 2345-48.)  Gaytan said the people with him were Chicali gang members and that the party was on a rival gang's turf, but neither group wanted a confrontation so they moved on without incident.  (RT 2348-53.)

Lewis Yablonsky, professor emeritus of sociology and criminology at California State University Northridge, testified as the defense gang expert.  (RT 2390-91.)  Dr. Yablonsky was retained to conduct an evaluation of Petitioner's background as a member of a criminal street gang, and opined that at the time of the shooting Petitioner was not a gang member, but was an outsider and a dropout of the Chicali gang.  (RT 2397-2405.)  On cross-examination Dr. Yablonsky admitted that Petitioner had at one time been a member of the Chicali gang, and stated that it if Petitioner had gotten his gang tattoos after he had been released from the California Youth Authority, as his mother testified, he may not have dropped out of the gang.  (RT 2180, 2415, 2417.)

Juan Baltazar testified that he knew Petitioner and Galstelum and said he was not at Petitioner's house on September 15-16, 2001, as Villa had testified, but was working and living in Long Beach, California.  (RT 2429-31, 2435.)  Baltazar admitted he had lived at Petitioner's house for a year in 2002, and was friends with the family.  (RT 2441.)  The defense introduced Baltazar's pay stub for that period, which did not indicate which days he had worked.  (RT 2431-

33, 2442.)  Joseph Somenek was recalled and testified that it was his idea for him and Agent Soto to interview Luis Santoyo, and it arose when he heard a "hit" had been ordered on Santoyo while listening to recorded jail conversation related to the Jesse Garcia killing.  (RT 2445-48.)

David Tirado, an Imperial County Lieutenant Sheriff, testified that the jail visitation logs indicated that Luis Santoyo was visited in jail on August 24, 2006.  (RT 2544-47.)

*Petitioner's co-defendant's case*

Gastelum's attorney made an opening statement.  (RT 2451-54.)  He then called Romona Valdez, Gastelum's mother, to testify that Gastelum was not a member of the Chicali gang, but was a member of the Imperial gang along with his brother, and that he was not in jail with Luis Santoyo at the times Santoyo testified that Gastelum made statements to him.  (RT 2454-60.)  On cross-examination she admitted she had been convicted of a felony, and said that Gastelum occasionally visited her when she lived in Imperial, California, which is near Brawley, during the time frame the shooting took place, and that he had spent time in Brawley where he had aunts and cousins.  (RT 2463-67.)  Although she maintained that her son was in Los Angeles on the night of the shooting, she admitted she did not tell that to the police.  (RT 2465-69.)

Gastelum's sister, father and grandmother all testified that Gastelum lived in Huntington Park in Los Angeles in September of 2001.  (RT 2478-88, 2499-2502, 2504-07.)  His sister did not recall him going to the Imperial Valley on the weekend of September 15-16, 2001.  (RT 2478-88.)  She said he did go to the Imperial Valley at least once a month during that time frame to check in with his parole officer, but he usually went during the week.  (RT 2490.)

Erik Partugal testified that he was a member of the Broleno gang, that he had met Gastelum in prison, and that Gastelum was not a member of Chicali gang.  (RT 2511-12.)  Partugal, who admitted to having been convicted of "quite a few" felonies, testified that he also knew Francisco Hernandez, a fellow Broleno member, and said that Hernandez told him that it was too dark and he was not paying attention so he did not see who shot him.  (RT 2512, 2515-16, 2521.)  Eric Basurto testified that he and Gastelum are both members of the Imperial gang, and that one cannot be a member of both Imperial and Chicali.  (RT 2523-25.)  Sergeant Pumphrey was recalled and testified regarding the dates Gastelum was in prison and in jail,

which his attorney argued showed he was not available on the dates Santoyo said they spoke. (RT 2532-41.)

Michelle Rodriguez, the deceased victim's aunt, testified that she was at the party on B Street in Brawley when the shooting took place, and said the lighting was poor in front of the house that night. (RT 2551-53.) She said she was a former Broleno member, that the murder victim Jesse Garcia was her nephew but was not a gang member and had nothing to do with gangs, and that she saw Petitioner and Gastelum hang out with Chicali gang members. (RT 2553-57.) Gilbert Rodriguez testified that he did not know who shot Francisco Hernandez, and that he told Agent Soto on December 6, 2006, that Hernandez did not tell him who shot him. (RT 2732.)

*Prosecution's rebuttal case*

Francisco Beltran testified that he had been convicted of several felonies, had been married to Gastelum's mother for four years beginning in 1999, and that Gastelum was a member of the Chicali Brasas gang in 2001. (RT 2735-38.) Beltran said he was in a jail van being transported with Gastelum when Gastelum shouted that he was a rat and asked fellow prisoners to assault him. (RT 2739-40.) Gastelum told him he had buried a gun he had used to kill someone in their yard. (RT 2754.) Petitioner's wife was recalled and testified that she recognized Petitioner's voice and Petitioner's mother's voice on a recorded call from jail during which Petitioner provided detailed instructions on how to access another person's voicemail. (RT 2758-63.) A forensic pathologist testified that Jesse Garcia spent three months in a coma and died of a gunshot wound to the head. (RT 2798-2807.) The general manager of the AMC Theater chain where Juan Baltazar worked in 2001, testified that corporate records indicated he was scheduled to be off work on September 15-16, 2001. (RT 2811-15.) John Seaman, an El Centro Police Officer, testified that he performed a search of Petitioner's house on September 18, 2001, during which he found a police scanner. (RT 1821-23.)

Agent Somenek was recalled to testify that he and Agent Soto had interviewed Carlos Landa on July 3, 2008, and a recording of that interview was played for the jury, a transcript of which is in the record. (RT 2847-51; CT 732-45.) Landa is heard saying that Petitioner is the

type of person who "won't hesitate to shoot you" and if "you cross him he'll kill you." (CT 739.) The court denied Petitioner's mistrial motion based on the prejudicial impact of Landa's statements. (RT 2857-59.) As discussed below, Petitioner contends in the second part of claim one that Landa's statements were so prejudicial their admission denied him due process and a fair trial. (Pet. at 10; Pet. Mem. at 27-36.)

*Petitioner's surrebuttal case*

Petitioner's counsel called Robert Cortez, a Lieutenant with the Imperial County Sheriff's Department, who testified regarding Carlos Landa's incarceration record. (RT 2874-77.) Carlos Landa testified that he had no contact with Petitioner while he was incarcerated, that Petitioner did not ask him to convey a message to anyone, and that he only told Soto and Somenek what they wanted to hear to get them off his back. (RT 2881-85, 2890.) He said he did not know Petitioner very well, was not afraid of him, and that he told the officers that Petitioner was the type of person who would kill you if you crossed him because that is what he had been told by Santoyo. (RT 2885-89.) John Anthony Sepulveda, Petitioner's brother, testified that Petitioner failed the written test for a drivers' license about ten times "because he's not too smart," and passed only because Sepulveda took the test for him. (RT 2894-96.) He said there was never a police scanner in their home, and that Gastelum was a good friend but was not a Chicali member. (RT 2897-2901.) Antonio Fernandez was recalled to testify there was no police scanner in Petitioner's house when it was searched on September 18, 2001. (RT 2902-04.)

The attorneys presented closing arguments. (RT 2928-3067.) The jury deliberated approximately three and one-half days, and on August 6, 2008, returned guilty verdicts of murder and conspiracy to commit murder as to both defendants. (RT 3110-30.) The jury found the gang enhancement allegation, that the murder was carried out to further the activities of a criminal street gang, true as to Petitioner but not true as to Gastelum. (Id.) On October 15, 2008, Gastelum was sentenced to twenty-five years-to-life on each count. (RT 3157.) On November 5, 2008, Petitioner was sentenced to twenty-five years-to-life without the possibility of parole on each count. (RT 3179.) The state appellate court later found that the prosecution had failed to introduce sufficient evidence to establish that Chicali gang members have

consistently and repeatedly committed the criminal activities enumerated in the relevant statute, and therefore insufficient evidence existed to support the special circumstance finding, and remanded with instructions to resentence Petitioner to a term of twenty-five years-to-life. (Lodgment No. 8.)

## IV.

## PETITIONER'S CLAIMS

The Petition presents the following claims:

(1) Petitioner was denied his Fifth, Sixth, Eighth and Fourteenth Amendment rights when the trial court admitted highly prejudicial character evidence in permitting the prosecutor to ask Carlos Landa if he had said that Petitioner was the type of person who would not hesitate to shoot someone, and in permitting introduction of a recording in which Landa made similar statements. (Pet. at 10; Pet. Mem. at 28-41.)

(2) Petitioner was denied his Sixth and Fourteenth Amendment right to the effective assistance of counsel because his trial counsel failed to call as a witness a handwriting expert who had been retained by the defense and was willing to testify that the letters which Villa said he had written and sent to the FBI were actually written by Agent Soto. (Pet. at 10.)

(3) Petitioner was denied his Sixth and Fourteenth Amendment right to the effective assistance of counsel because his appellate counsel failed to raise claim five on appeal, and failed to exhaust the juror misconduct claims by federalizing them in state court. (Pet. at 10.)

(4) Petitioner was denied his Fifth, Sixth and Fourteenth Amendment rights to due process of law and to trial by an impartial jury because the trial court did not remove the two jurors who conversed with the husband of prosecution witness Mary Vasquez. (Pet. at 10.)

(5) Petitioner was denied his Sixth and Fourteenth Amendment right to the effective assistance of counsel because his trial counsel failed to request removal of the juror who was friends with the husband of prosecution witness Mary Vasquez. (Pet. at 11.)

(6) Petitioner was denied his Fifth, Sixth and Fourteenth Amendment rights to due process and a fair trial because the trial court allowed admission of evidence that Petitioner had a conviction for street terrorism. (Pet. at 11.)

# V.

## DISCUSSION

For the following reasons, the Court finds that Petitioner is not entitled to habeas relief. The Court therefore **RECOMMENDS** the Petition be **DENIED**.

**A.      Standard of Review**

This action was initiated after enactment of the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214.  Under 28 U.S.C. § 2254(d), as amended by AEDPA:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d) (West 2006).

A state court's decision may be "contrary to" clearly established Supreme Court precedent (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent."  Williams v. Taylor, 529 U.S. 362, 405-06 (2000).  A state court decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case."  Id. at 407.  A decision may also involve an unreasonable application "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply."  Id.

/ / /

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. . . . Rather, that application must be objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citations omitted). Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the United States Supreme] Court's decisions . . ." Williams, 529 U.S. at 412. In order to satisfy section 2254(d)(2), a federal habeas petitioner must demonstrate that the factual findings upon which the state court's adjudication of his claims rest, assuming it rests upon a determination of the facts, are objectively unreasonable. Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

"As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. __, 131 S.Ct. 770, 786-87 (2011). The Supreme Court has stated that "[i]f this standard is difficult to meet, that is because it was meant to be . . . [as it] preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court decision conflicts with this Court's precedents." Id. at 786 ("Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.") (internal quotation marks omitted).

**B.    Claim 1**

Petitioner alleges in his first claim that he was denied his Fifth, Sixth, Eighth and Fourteenth Amendment rights when the trial court: (a) permitted the prosecutor to ask Carlos Landa whether he had previously told a police officer that Petitioner was the type of person who would kill someone who crossed him; and (b) permitted the admission of Landa's recorded statement to that effect, and to the effect that Petitioner was the type of person who would not hesitate to shoot someone. (Pet. at 10; Pet. Mem. at 26-36.) He contends the question was designed to elicit unduly prejudicial character evidence, and that the recording introduced such evidence. (Id.)

1   Respondent argues that Petitioner is not entitled to federal habeas relief because the state

2   court's denial of the claim, on the basis that asking Landa whether he was afraid to testify was

3   proper and the introduction of his statements harmless, was neither contrary to, nor involved an

4   unreasonable application of, clearly established federal law. (Ans. Mem. at 6-8.) Respondent

5   contends the evidence was admissible because it was relevant to Landa's credibility, and even

6   if it was not, the United States Supreme Court has never held that federal habeas relief is

7   available based on the admission of irrelevant or prejudicial evidence in a state criminal trial.

8   (Id.) Respondent also contends that any error was clearly harmless. (Id.)

9   Petitioner presented this claim to the California Supreme Court in his petition for review.

10  (Lodgment No. 9.) That court summarily denied that petition without a statement of reasons or

11  citation of authority. (Lodgment No. 10.) The claim was also raised in the state appellate court,

12  which denied it on the merits. (Lodgment No. 5 at 71-85; Lodgment No. 8, People v. Armenta,

13  D054071, slip op. at 34-38.) "Where there has been one reasoned state judgment rejecting a

14  federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest

15  upon the same ground." Ylst v. Nunnemaker, 501 U.S. 797, 803-06 (1991). The Court will

16  apply 28 U.S.C. § 2254(d) to the appellate court opinion, which stated:

17      Armenta contends that the trial court erred in permitting the prosecutor to
        ask Landa whether he had said that Armenta would not hesitate to shoot someone.
18      According to Armenta, this question called for a response that would constitute
        inadmissible character evidence.
19

20      Armenta further contends that the trial court abused its discretion in
        admitting the portion of the interview in which Landa said that Armenta was the
21      type of person who would kill. According to Armenta, although the People "could
        argue that the statements on the tape should come in to impeach Landa and permit
22      the jury to assess his credibility . . . (s)ince the credibility issue only arose because
        of the court's initial erroneous ruling in allowing the question, this rationale . . .
23      (is) flawed." Armenta further argues that, even assuming the court's initial ruling
        regarding the prosecutor's questioning of Landa "is viewed as correct," the
24      "admission of the tape still amounted to an abuse of the court's discretion"
        because the statements were highly prejudicial.

25      (i)    *The prosecutor did not elicit inadmissible evidence
               by asking Landa questions concerning whether he*
26             *was afraid to testify*

27      Evidence Code section 1100 provides that "(e)xcept as otherwise provided
        by statute, any otherwise admissible evidence (including evidence in the form of
28      an opinion, evidence of reputation, and evidence of specific instances of such
        person's conduct) is admissible to prove a person's character or a trait of his

character." Evidence Code section 1101 makes evidence of a person's character inadmissible, "when offered to prove conduct on a specified occasion." [Footnote omitted] Evidence Code section 1101 exempts from its scope "evidence offered to support or attack the credibility of a witness." (*Id.* subd. (c).)

The prosecutor asked Landa whether he was afraid of Armenta - the implication being that Landa's fear of Armenta may have caused Landa to be less than truthful in his trial testimony. Landa indicated that he was not afraid of Armenta, responding, "What for?" The prosecutor's questions about whether Landa had made prior statements that suggested otherwise were intended to raise questions about the veracity of Landa's claim at trial that he did not fear Armenta.

"Evidence that a witness . . . fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible." (*People v. Burgener* (2003) 29 Cal.4th 833, 869.) The prosecutor's questions to Landa thus did not run afoul of Evidence Code section 1101's prohibition against admitting character evidence, because the evidence that the prosecutor was attempting to elicit was intended to challenge the credibility of Landa's trial testimony. The trial court did not err in permitting the prosecutor to ask Landa questions about earlier statements he had made that suggested that he was afraid of Armenta, even if those statements involved Landa's opinion about Armenta's character.

      (ii)     *Even assuming that the trial court's decision to allow the jury to hear a prejudicial portion of Landa's tape recorded interview was error, the error was harmless*

Armenta argues that the trial court was called upon to exercise its discretion under Evidence Code section 352 in making a decision as to whether to redact the portion of the tape recording in which Landa told Soto that Armenta was the type of person who would "kill you," and that the court abused that discretion in concluding that the probative value of those statements outweighed their highly prejudicial nature.

Evidence Code section 352 provides, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "'We apply the deferential abuse of discretion standard when reviewing a trial court's ruling under Evidence Code section 352. (Citation.)'" (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121.)

Landa's statement to the effect that Armenta would "kill you" if "you cross him" was undoubtedly highly prejudicial evidence of Armenta's character. In addition, it was not necessary to introduce that particular statement in evidence to impeach Landa, because there were other portions of the tape recording that clearly established that Landa's in-court testimony was of questionable veracity. For example, at trial, Landa claimed that he had not told Soto that Armenta tried to get Landa to pass a message to Santoyo, but the tape recording demonstrates that Landa did suggest to Soto that Armenta had asked him to be a messenger. Under these circumstances, one could reasonably question whether the trial court appropriately weighed the probative value of the recorded statement that Landa made during his interview with Soto to the effect that Armenta was the type of person who would kill you if you crossed him, against its highly prejudicial nature.

We need not determine whether the trial court abused its discretion in admitting in evidence Landa's statements about Armenta's character as someone who would kill if crossed, however, because even assuming that it was an abuse of discretion to allow this statement in evidence, we conclude that the admission of this evidence was harmless in the context of the entire trial.

In discussing the standard of prejudice that this court should apply to the admission of Landa's recorded statements about Armenta's character as someone who would kill if crossed, Armenta contends that the error is of constitutional scope because it violated his right to a fundamentally fair trial and to due process. Armenta argues that the harmless beyond a reasonable doubt standard announced in *Chapman v. California* (1967) 386 U.S. 18, 24 is thus the appropriate standard to apply in this situation. Because we do not view the admission of this character evidence as having rendered Armenta's trial fundamentally unfair, we apply the standard for assessing prejudice set forth in *People v. Watson* (1956) 46 Cal.2d 818. (See *People v. Malone* (1988) 47 Cal.3d 1, 22.) FN12 Under this standard, we do not reverse unless it is reasonably probable that Armenta would have obtained a more favorable outcome if the challenged evidence had been excluded. (*Watson*, *supra*, 46 Cal.2d at p. 836.) We conclude that there is no reasonable probability that Armenta would have received a more favorable outcome if the court had required the prosecutor to redact the portion of Landa's recorded statement to Soto in which Landa expressed his view that Armenta was the type of person who would kill if crossed.

> FN12. Armenta contends that "[e]vidence introduced for no other purpose than to show criminal disposition violates the protections afforded by the Due Process Clause to all those accused of criminal conduct." However, it is clear that evidence of Landa's statements to Soto were introduced to challenge Landa's credibility. Although the nature of the statements was highly prejudicial, this does not mean that the statements were introduced for "no other purpose than to show criminal disposition." We therefore reject Armenta's contention that the admission of this evidence raises constitutional concerns.

Armenta argues that the evidence against him was "extremely weak." He acknowledges that "Villa's testimony, if believed, was highly incriminating," but suggests that "there were numerous reasons for the jury to doubt or reject (Villa's) claims." Armenta similarly attacks the credibility of other witnesses, including Salazar and Santoyo, and asserts that "one factor which very likely contributed to this result (i.e., his conviction) was the opinion of Armenta's character offered by Landa." We disagree. There was substantial evidence of Armenta's guilt, and the jury clearly believed the multiple witnesses who testified against him - all of whom told stories consistent with the others' accounts concerning the nature of Armenta's involvement in this shooting. Although some of the witnesses' testimony may have included inconsistencies, the jury was free to weigh those inconsistencies in the context of each witness's full testimony in determining issues of credibility. We are confident that it is not reasonably probable that Armenta would have received a more favorable result if the trial court had not admitted Landa's tape recorded statement about Armenta's character, even in view of its prejudicial nature.

(Lodgment No. 8, <u>People v. Armenta</u>, D054071, slip op. at 33-38.)

/ / /

The United States Supreme Court has held that an inquiry into whether the evidence was "incorrectly admitted pursuant to California law . . . is no part of a federal court's habeas review of a state conviction." Estelle v. McGuire, 502 U.S. 62, 67 (1991). The Court left open the issue as to "whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime." Id. at 75 n.5. The Ninth Circuit has read McGuire as providing that there are circumstances under which a federal habeas petitioner can establish a federal due process violation by showing that the admission of evidence was so prejudicial that it rendered the trial fundamentally unfair. See Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir. 1995) ("The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process."), citing McGuire, 502 U.S. at 67-69; Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991) ("The issue for us, always, is whether the state proceedings satisfied due process; the presence or absence of a state law violation is largely beside the point."); see also Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (granting habeas relief under AEDPA based on state court's limitation on cross-examination victim and the refusal to permit introduction of impeachment evidence, but stating that the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.")

In Alberni v. McDaniel, 458 F.3d 860 (9th Cir. 2006), the Ninth Circuit recognized that every circuit, in cases decided before AEDPA was enacted, has acknowledged that improper introduction of evidence may violate federal due process if it renders a trial fundamentally unfair. Id. at 865-66. However, the Alberni Court held that because the Supreme Court in McGuire specifically reserved ruling on the issue regarding whether introduction of propensity evidence can give rise to a federal due process violation, and has denied certiorari at least four time on the issue since McGuire was decided, the right asserted "has not been clearly established by the Supreme Court, as required by AEDPA." Id. at 866-67; see also Wright v. Van Patten, 552 U.S. 120, 125-26 (2008) (holding that the state court could not have unreasonably applied federal law if no clear Supreme Court precedent exists).

Thus, to the extent Petitioner alleges that introduction of Landa's statements amounted to a violation of federal due process because it unfairly permitted the jury to infer that he had a propensity to commit crimes similar to the ones with which he was charged, the state court's adjudication of the claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law.  Williams, 529 U.S. at 405-07; Lockyer, 538 U.S. at 75-76; Wright, 552 U.S at 125-26; Holley, 568 F.3d at 1101; Alberni, 458 F.3d at 867.  Petitioner argues that the Ninth Circuit erred in Holley and Alberni when holding that there is no clearly established federal law stating that a due process violation can be shown by the introduction of overly prejudicial evidence. (Traverse at 6-7.)  This Court, however, is bound by Ninth Circuit precedent.  In any case, even if Petitioner is correct that a federal due process violation can arise from the introduction of overly prejudicial evidence in a state criminal trial, for the same reasons discussed immediately below, the evidence introduced in this case does not rise to such a level, and even if it did, any such error was harmless.

Assuming Petitioner could demonstrate that a federal constitutional error occurred as a result of admission of Landa's statements, and assuming Petitioner could demonstrate it was objectively unreasonable for the state supreme court to conclude otherwise (as well as that court's consequent determination that application of the Chapman harmless beyond a reasonable doubt standard was not required), this Court is still required to determine whether the error was harmless under the standard announced in Brecht v. Abrahamson, 507 U.S. 619 (1993).  See Fry v. Pliler, 551 U.S. 112, 119-22 (2007) (holding that "whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard of Chapman," harmless error analysis under Brecht is still required, even after a showing that the state court opinion was contrary to or involved an unreasonable application of clearly established federal law.)  The Brecht standard provides that habeas relief is not available "unless the error resulted in 'substantial and injurious effect or influence in determining the jury's verdict,' . . . or unless the judge 'is in grave doubt' about the harmlessness of the error."  Medina v. Hornung, 386 F.3d 872, 877 (9th Cir. 2004), quoting Brecht, 507 U.S. at 637 and O'Neal v. McAninch, 513 U.S. 432, 436 (1995).

As set forth above in Section III of this Report reciting the trial evidence, Daniel Villa testified that on the day of the shooting Petitioner drove him past the house where the shooting was to take place later that night, and asked Villa if he was willing to do a shooting. Villa returned to Petitioner's house where Gastelum volunteered to do the shooting on behalf of their gang. Villa stayed at the house and said that Petitioner and Gastelum returned a few minutes after the shooting had been reported on a police scanner. Villa said they were both happy about the shooting and that Gastelum described how the shooting had taken place. In addition, Petitioner's fellow gang members testified against him, despite a deeply ingrained prohibition against testifying against fellow gang members, because they disapproved of the killing of an innocent youngster. Israel Salazar, a fellow gang member, testified that Petitioner said he was going to the party to shoot someone, that he asked Salazar to participate in the shooting, and that he hid the gun used in the shooting at Salazar's house after admitting "something went down on B Street" during which someone got shot in the head. Salazar testified that Petitioner later admitted that Gastelum was the shooter and that Petitioner had asked Salazar not to testify against them. Luis Santoyo, another fellow gang member, testified that Petitioner often spoke of the shooting with delight and admitted it was done in retaliation for a prior shooting of Petitioner's friend by a Broleno gang member. Santoyo also testified that he had been asked by Gastelum not to testify or to lie if he did. Hernandez, the victim who was shot and survived, positively identified Gastelum as the shooter. In addition, Petitioner sent a letter to the FBI admitting he had information about the shooting, including where the gun was located, and Gastelum was overheard on a recorded conversation stating that the gun which was seized from his house was not the gun he used to shoot the victims.

Thus, evidence regarding Landa's opinion of Petitioner as a person who would kill someone who crossed him and who would not hesitate to shoot someone, which Landa later disavowed in front of the jury, when considered in relation to the evidence presented at trial of Petitioner's direct participation in the crime, was not so strong as to have had an effect on the outcome of the trial. Rather, Landa's statements were at best cumulative to other negative evidence regarding Petitioner's character, which involved his participation in gang-related

activities, including his conviction for street terrorism, and in particular his stated delight with his participation in the killing of a youth who was not involved in gangs yet was murdered in retaliation for the non-fatal gang-related shooting of Petitioner's friend years earlier. This Court is not "in grave doubt" about whether any error in admitting the evidence actually harmed Petitioner. See Medina, 386 F.3d at 877 ("The relevant inquiry is whether the tainted evidence actually harmed the appellant."); Brecht, 507 U.S. at 637; O'Neal, 513 U.S. 436.

Based on the foregoing, the Court finds that the adjudication of claim one by the state appellate court was neither contrary to, nor involved an unreasonable application of, clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Richter, 131 S.Ct. at 786-87; Wright, 552 U.S at 125-26; Andrade, 538 U.S. at 75-76; Miller-El, 537 U.S. at 340; Williams, 529 U.S. at 412; Holley, 568 F.3d at 1101; Alberni, 458 F.3d at 867. The Court also finds that any possible constitutional violation was harmless. Fry, 551 U.S. at 120; Brecht, 507 U.S. at 637; Medina, 386 F.3d at 877. The Court recommends that habeas relief be denied as to claim one.

## C.    Claim 2

Petitioner contends in his second claim that he was denied his Sixth and Fourteenth Amendment right to the effective assistance of counsel because his trial counsel failed to call as a trial witness a handwriting expert who had been retained by the defense and had concluded that Agent Soto wrote the two letters which Daniel Villa testified he had written and sent to the FBI. (Pet. at 10.)

Respondent contends that because Petitioner's counsel failed to authenticate the handwriting expert's report, it was not admissible at trial, and that even if it was, Petitioner has not shown he was prejudiced by the failure to introduce the report or call the expert to testify. (Ans. Mem. at 16-21.) Respondent also contends that the state supreme court's summary denial of this claim, which was raised in the state habeas petition filed in that court, without issuing an order to show cause, reflects a finding that Petitioner presented insufficient evidence in the state court to support the claim. (Id. at 20, citing Cullen v. Pinholster, 563 U.S. ___, 131 S.Ct. 1388, 1402 n.12 (2011) ("Under California law, the California Supreme Court's summary denial of

a habeas petition on the merits reflects that court's determination that 'the claims made in the petition do not state a prima facie case entitling the petitioner to relief.'")

Petitioner presented this claim to the California Supreme Court in his habeas petition. (Lodgment No. 11 at 29-40.)  That court summarily denied the petition without a statement of reasoning or citation of authority.  (Lodgment No. 12.)  There is no lower state court opinion addressing claim two.  The Court must therefore conduct an independent review of the record in order to determine whether the state supreme court's summary denial involved an unreasonable application of clearly established federal law.  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002) (holding that when the state court reaches the merits of a claim but provides no reasoning to support its conclusion, "although we independently review the record, we still defer to the state court's ultimate decision."); Greene v. Lambert, 288 F.3d 1081, 1089 (9th Cir. 2002) ("(W)hile we are not required to defer to a state court's decision when that court gives us nothing to defer to, we must still focus primarily on Supreme Court cases in deciding whether the state court's resolution of the case constituted an unreasonable application of clearly established federal law.")

When conducting an independent review of a silent denial of a claim by the California Supreme Court, a federal habeas petitioner "can satisfy the 'unreasonable application' prong of § 2254(d)(1) only by showing that 'there was no reasonable basis' for the California Supreme Court's decision." Pinholster, 131 S.Ct. at 1402, quoting Richter, 131 S.Ct. at 784.  "Under § 2254(d), a habeas court must determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."  Richter, 131 S.Ct. at 786.  The state supreme court's silent denial was an adjudication on the merits of the claim.  See Pinholster, 131 S.Ct. at 1402 ("Section 2254(d) applies even where there has been a summary denial."), citing Richter, 131 S.Ct. at 786.

For ineffective assistance of counsel to provide a basis for habeas relief, Petitioner must demonstrate two things.  First, he must show that counsel's performance was deficient. Strickland v. Washington, 466 U.S. 668, 687 (1984). "This requires showing that counsel made

errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. Second, he must show counsel's deficient performance prejudiced the defense. Id. This requires showing that "counsel's errors were so serious as to deprive [Petitioner] of a fair trial, a trial whose result is reliable." Id. To satisfy the prejudice prong, Petitioner need only demonstrate a reasonable probability that the result of the proceeding would have been different absent the error. Id. at 694. A reasonable probability in this context is "a probability sufficient to undermine confidence in the outcome." Id. Petitioner must establish both deficient performance and prejudice in order to establish ineffective assistance of counsel. Id. at 687.

        "Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. __, 130 S.Ct. 1473, 1485 (2010). "The standards created by Strickland and section 2254(d) are both highly deferential and when the two apply in tandem, review is 'doubly' so." Richter, 131 S.Ct. at 788 (citations omitted). These standards are "difficult to meet" and "demand that state court decision be given the benefit of the doubt." Pinholster, 121 S.Ct. at 1398. Federal habeas relief functions as a "guard against extreme malfunctions in the state criminal justice systems," and not simply as a means of error correction. Richter, 131 S.Ct. at 786, quoting Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979). "Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial." Strickland, 466 U.S. at 687.

        Petitioner contended in the state supreme court habeas petition that two handwriting experts, Curtis Baggett and Manuel Gonzales, were designated by his trial counsel and appointed by the court, and that Baggett wrote a report concluding that Agent Soto had written the letters that Villa claimed he had authored and sent to the FBI. (Lodgment No. 11 at 31-32.) There is no mention of what conclusion, if any, was reached by Gonzales, but neither expert was called as a witness at Petitioner's trial. (Id.) Petitioner has submitted documents regarding the appointment of the experts, which includes copies of the Villa letters and samples of Soto's signature which Baggett relied upon to determine that Soto wrote the letters. (Pet. Exs. O-Y [ECF Nos. 2-12 to 2-26].) Petitioner submits a copy of Baggett's report, which was notarized

on February 1, 2008, prior to the beginning of trial on June 11, 2008, but which is signed by Baggett as "Respectfully submitted" rather than under penalty of perjury. (Pet. Ex. Q [ECF No. 2-18 at p. 3].)   Respondent contends that such a signature does not constitute sufficient authentication under California law, that the report therefore would not have been admissible at trial, and that the California Supreme Court could have reasonably found that Petitioner had failed to provide sufficient evidence to support the ineffective assistance of counsel claim presented in the state habeas petition. (Ans. Mem. at 20.)

Even assuming Baggett's report was not admissible at trial, Baggett states in his report that he was willing to testify at trial that he compared the Villa letters with Soto's signature, and that in his expert opinion Soto wrote the Villa letters. (Pet. Ex. Q [ECF No. 2-18 at 3].)   The trial court authorized compensation for Baggett's trial testimony. (Pet. Ex. V [ECF No. 2-23 at 1].)   Petitioner contends here, as he did in the state court, that his trial counsel was deficient in failing to call Baggett to testify, not that counsel was deficient in failing to introduce the report. Thus, it appears unlikely that the state supreme court determined that a failure to properly authenticate the report constituted a failure by Petitioner to support his claim that trial counsel was deficient in failing to call Baggett as a witness. Pinholster, 131 S.Ct. at 1402 n.12 ("It appears that the [California Supreme] court generally assumes the allegations in the petition to be true, but does not accept wholly conclusory allegations, . . . and will also review the record of the trial to assess the merits of the petitioner's claims.") (internal citations and quotation marks omitted).

However, the state supreme court may have reasonably found that Petitioner had failed to demonstrate that counsel's decision not to call Baggett as a trial witness was a tactical one. See Strickland, 466 U.S. at 680 ("[T]he defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.")   Villa had already provided conflicting testimony regarding the letters. As Petitioner points out, at first Villa said he wrote them both, then said he had help writing the English version of the letter, and explained that because he signed the letter and dictated its contents he considered it his letter whether he physically wrote it or not. Villa also impeached his own credibility by admitting to

a federal conviction for bringing cocaine into the country, membership in a street gang, and drug use, and his girlfriend testified that he made his living selling drugs. Presenting expert evidence that Soto rather than Villa had written the letters would have had little additional impeachment value. It might even have had a negative impact if the prosecutor had presented expert evidence that Villa had written the letters. Petitioner retained two experts and apparently only one was willing to testify that Soto wrote the letters, indicating the possibility that another expert might testify conversely. The only example of Soto's writing which Baggett used to compare Soto's writing with Villa's were samples of Soto's signature, and there is no indication in the record whether Baggett would have been a persuasive or effective witness.

However, even if Petitioner could overcome the presumption that counsel's decision was a tactical one, the state supreme court might have reasonably determined that Petitioner had not demonstrated prejudice. See Strickland, 466 U.S. at 687 (holding that deficient performance and prejudice must both be shown to constitute a constitutional violation). Petitioner contends that if he could have established that Soto had written the letters, it would have implied that Soto had manipulated Villa into becoming a witness, had perhaps manipulated Villa's testimony, and maybe coerced other witnesses to testify against Petitioner. He relies on a statement made by the prosecutor during her opening statement where she explained that although Hernandez had been shot and wounded he had hesitated to come forward because he was a runaway from a juvenile placement home and was afraid of retaliation. (RT 782-83.) She then stated:

> That's why the case was a cold case for several years. It wasn't until we learned of Daniel Villa when he wrote from prison that the case started to break wide open. Francisco Hernandez eventually decided that he was going to tell the truth. And what happened was, once again, at the Imperial County Jail where everything seemed to take place. He was in custody. And as he is walking down the hallway, for the first time since 2001 he comes face-to-face with the person who shot him. He will tell you that person is Jesus Gastelum. After that happened, and after special Agent Soto came to talk to him as he had been trying to for years, he kept coming back, coming back, coming back, Francisco agreed to testify. At that time he said, "I'll never forget that face. I know the person that shot me." He told Sergeant Soto. You will see him on the stand as well.

> All these people, the only one that received any consideration would be Daniel Villa. Daniel Villa basically was allowed to stay in the country through the end of this trial. Beyond that, he has had no promises. We didn't make his sentence any shorter. But we did tell him we would keep him in the United States so he could come testify in court. That's it. So you will hear that the other

1
2
witnesses are friends of the defendants, their own gang members.  That's the people who are going to come to court and tell you what the defendants did to Jesse Garcia and Francisco Hernandez.  Thank you.

3   (RT 783-84.)

4        As the prosecutor noted, Hernandez provided direct eyewitness evidence that Gastelum

5   was the shooter.  Villa merely placed Petitioner with Gastelum at the time of the shooting and

6   provided cumulative evidence that Petitioner had participated in the shooting.  Other witnesses

7   also provided evidence of Petitioner's involvement, including Petitioner's fellow gang members

8   Santoyo and Salazar, and Petitioner himself through his admissions.  In light of the evidence

9   against Petitioner provided by his fellow gang members detailed above with respect to his first

10  claim, and in light of Petitioner's own admissions, the failure of Petitioner's counsel to call

11  Baggett to testify that in his opinion Soto wrote the Villa letters, thereby implying that he

12  manipulated Villa's testimony, could not be an error so severe as to demonstrate "a probability

13  sufficient to undermine confidence in the outcome."  Strickland, 466 U.S. at 694.  Petitioner has

14  not surmounted Strickland's high bar, and has not demonstrated that his counsel made an error

15  which was so serious as to deny him a fair trial.  Padilla, 130 S.Ct. at 1485; Strickland, 466 U.S.

16  at 687.

17       Based on an independent review of the record, the Court finds that the state supreme

18  court's silent denial of claim two was neither contrary to, nor involved an unreasonable

19  application of, clearly established federal law, and was not based on an unreasonable

20  determination of the facts in light of the evidence presented in the state court proceedings.

21  Richter, 131 S.Ct. at 786-87; Padilla, 130 S.Ct. at 1485; Andrade, 538 U.S. at 75-76; Miller-El,

22  537 U.S. at 340; Williams, 529 U.S. at 412; Strickland, 466 U.S. at 687.  The Court therefore

23  recommends denying habeas relief as to claim two.

24  **D.    Claim 4**[2]

25       Petitioner contends in claim four that he was denied his Fifth, Sixth and Fourteenth

26  Amendment rights to due process of law and to a fair trial by an impartial jury when the husband

27  _____

28       [2] Claim three will be addressed following claim five, as they are interrelated.

1  of prosecution witness Mary Vasquez conversed with two jurors.  (Pet. at 10.)  He contends the

2  jurors should have been excused and the trial court failed to make an adequate inquiry.  (Id.)

3      Respondent contends that Petitioner has failed to show that the jurors conversed with a

4  trial witness, as opposed to the witness's husband, that the jurors were examined for bias, and

5  Petitioner has established no basis for them to have been removed.  (Ans. Mem. at 10-16.)

6  Respondent contends that the denial of this claim by the state court was therefore not contrary

7  to clearly established federal law, and that any potential error was harmless.  (Id.)

8      Petitioner presented claim four to the state supreme court in a habeas petition which was

9  summarily denied without a statement of reasoning or citation of authority.  (Lodgment No. 11

10  at 42-48, Lodgment No. 12.)  He also raised the claim in the state supreme court in his petition

11  for review, which was summarily denied, and in the appellate court.  (Lodgment Nos. 8-10.)

12  Court will look through the silent denial by the state supreme court to the appellate court

13  opinion, which stated:

14          Armenta contends that "(j)uror misconduct occurred during the trial when
15      two jurors were introduced to Mary Vasquez, a key prosecution witness, by her
        husband, and then engaged in friendly conversation with Mr. Vasquez and
16      possibly with his wife as well prior to her testimony."  In the alternative, Armenta
        contends that the trial court abused its discretion "by failing to conduct an
17      adequate hearing regarding the contact between the jurors" and the witness and
        her husband.  According to Armenta, the first error deprived him of his right to
18      unbiased jurors, and the second deprived him of his right to an adequate appellate
        record.

19          1.   *Additional background*

20          One afternoon during the prosecution's case-in-chief, the trial court took
        a recess for approximately 10 minutes.  Upon returning to the courtroom, outside
21      the presence of the jury, the prosecutor informed the trial court that Armenta's
        attorney had indicated to the prosecutor that he believed he had seen a prosecution
22      witness, Mary Vasquez, "conversing with two jurors."  The prosecutor told the
        court that she "immediately went out . . . to stop it."  Vasquez informed the
23      prosecutor that she had not spoken with any jury members, but that her husband
        had spoken with two jurors.

24
            The trial court stated, "We're going to have to inquire and clear this up."
25      The court proceeded to question each of the two jurors separately.  The court
        engaged in the following colloquy with Juror 1:

26
            "THE COURT:  . . . I had some information that you were talking
27          to an individual outside just a few minutes ago wearing your juror
            badge.

28

"JUROR NUMBER 1:  Yes.

"THE COURT:  Did they approach you, sir?

"JUROR NUMBER 1:  Yeah.  He told me he('d) seen me someplace before and couldn't remember.

"THE COURT:  And?

"JUROR NUMBER 1:  I didn't remember him.

"THE COURT:  Okay.  Was there anything else that he told you?

"JUROR NUMBER 1:  No.

"THE COURT:  Did anybody else talk to you?

"JUROR NUMBER 1:  No.  Just the gentlemen there.

"THE COURT:  Okay.  And that is all that he discussed with you?

"JUROR NUMBER 1: He said he('d) seen me someplace before. I told him where I work at.  He said, okay.  That's where he saw me.  He used to bring dogs down there from the City.

"THE COURT:  So you talked a little bit about that?

"JUROR NUMBER 1:  That was it.

"THE COURT:  I mean, you mentioned where you worked, how you might have seen him before?

"JUROR NUMBER 1:  He might have seen me.

"THE COURT:  Anything else?

"JUROR NUMBER 1:  That's it."

After this exchange, the court permitted defense counsel to question Juror 1. Defense counsel asked Juror 1 if a lady sitting on the steps had conversed with him at all, to which Juror 1 answered "No."  The court admonished Juror 1: "Don't talk to anybody about the case.  Don't talk to witnesses, et cetera."

The court then called Juror 2 to the sidebar conference and engaged in the following colloquy with Juror 2:

"THE COURT: . . . (W)hen we were on our break, you were seen talking to some individuals outside.

"JUROR NUMBER 2:  Yeah.

"THE COURT:  Do you remember?

"JUROR NUMBER 2:  I know who I was talking to.  I know the guy.  I guess he is married to one of the witnesses.  I didn't know.

"THE COURT:  One of the witnesses is married to-

"JUROR NUMBER 2:  To my friend.

"THE COURT:  To the one you were talking to.  How long a conversation did you have?

"JUROR NUMBER 2:  Just hi and just asking me what I had.  I said I was on jury duty.

"THE COURT:  Did he ask you any questions?

"JUROR NUMBER 2:  No.

"THE COURT:  Did you ask him any questions?

"JUROR NUMBER 2:  No.  He just said he was there with his wife.  She was there for a case, that she was there for a case or something.  I don't know what it was.

"THE COURT:  He didn't ask you anything about the case?

"JUROR NUMBER 2:  No.  Nothing.

"THE COURT:  And you didn't tell him anything about the case?

"JUROR NUMBER 2:  Huh-uh.

"THE COURT:  Remember the admonition not to talk to anybody . . . about the case?

"JUROR NUMBER 2:  I just saw him and went, hi.

(¶) . . . (¶)

"THE COURT:  That's all we're doing right now, checking to make sure that no one is trying to talk to you about the case, you are not talking about the case.  Just making sure.  You did exactly what you are supposed to."

The court then asked defense counsel if he wished to question the juror.  Defense counsel asked Juror 2 if the lady seated on the steps had spoken to him.  Juror 2 responded, "No.  She just spoke to her husband.  I don't know her."  Defense counsel then asked which one of the two, "wife or husband," had approached him.  Juror 2 said that the man had approached him to shake his hand because they know each other.  Juror 2 stated that he knew the man from "(p)laying basketball," and that the man "works in our city, . . . Brawley (C)ity."  When asked if he had told the man that he was a juror on a case, Juror 2 said that the man had asked him what he was doing there, and Juror 2 responded that he was on jury duty.  The man did not say anything in response to Juror 2's statement that he was on jury duty, but instead "just talked to his wife" in Spanish.

The court stated, "It seems to me that it's okay," but resolved to talk to Vasquez's husband to "caution him."  The court said that what had occurred "was harmless," but that the court did not "want this to happen again."  The bailiff was

unable to locate Vasquez's husband that day.  The prosecutor informed the court that Vasquez and her husband may have left because Vasquez had been told that she would not be called as a witness that day.

Several days later, defense counsel returned to this issue.  Defense counsel stated:

> "I would just like to say, Your Honor, when I looked out there, I saw the two witnesses, I think it was (Juror No. 1) and the young man who I think is (Juror No. 2).  The husband of Mary Vasquez was extending his hand out to shake the hand of those two individuals.

> "He then introduced his wife, Mary Vasquez, to at least the young man, (Juror No. 2).  I think it was obvious to the witness, Mary Vasquez, and her husband that this was the department that they were going to be testifying in.  And they went out of their way to make contact with jurors that were going to hear her testimony.

> "I think that was a violation of 1122 of the Penal Code, which is the admonishment section, not in the sense that the jurors violated that section, but I believe it was the intent of the witness here to ingratiate herself through her husband with jurors. . . ."

Defense counsel contended that Vasquez had committed misconduct, and that the court either should sanction the prosecution by barring Vasquez from testifying, or should "giv[e] some type of admonishment to the jury that that was an improper contact by the witness and that under no circumstances should that witness have attempted to contact them."  The prosecutor argued that defense counsel was now claiming that something different had occurred than what defense counsel had originally represented.  The trial court stated:

> "But, you know, the jurors, those two particular jurors were questioned and admonished.  And then I repeated the instruction to the other jurors.  I think I underlined once again what they were to do with respect to people attempting to talk to them about the case.  In this particular situation, there was no discussion about the case at all.  Apparently one or two of the jurors knew the husband who is, of course - his name wasn't mentioned when we inquired as to whether they knew the witnesses or not.

> "It wasn't necessarily the witness that attempted to directly ingratiate herself with the jurors.  I don't know what the husband had in mind.  That's one thing that I intended to discuss with him.  He hasn't been available up to this point.  Before she testifies, I certainly would want to inquire further.  I suspect he will be there.  "In any event, I don't know that at this point I would bar Ms. Vasquez from testifying on the information that we have, the information we got from the jurors who were directly involved in this contact.  At most I would think that perhaps inquiring a little bit further with the husband might produce some kind of information, but I think that as it stands now I don't feel it's necessary to take any steps against Ms. Vasquez at this time.  I don't think that would be necessary.

"I think that if she does take the stand and testifie(s) that, you know, under cross-examination a lot of questions could be posed to her which might clarify this as well. At this point, I don't think that any further action from the Court is required. I would, though, as I indicated, like to speak to the husband to inquire. Although I don't even think that is necessary, absolutely necessary, but I think it would perhaps help things."

The following day, defense counsel again raised the issue. Defense counsel suggested that Vasquez's husband may have contacted all of the jurors, and asked that the court inquire of the entire jury to determine whether any other contact had occurred. The court responded, "I'm going to make a general inquiry about this just to make sure that nothing has happened because, again, if you are correct, Mr. Breeze, the Court wants to know about this and I will make an inquiry. (¶) I don't think, again, with respect to Mr. Vasquez'(s) approach of the jurors, I don't know that that can really be attributed to Mrs. Vasquez. I will inquire about the other jurors."

As soon as the prosecutor called Vasquez to testify, the trial court said to the jury:

"Ladies and gentlemen, last week I had occasion to talk to two jurors about possible, you know, discussion with people that were witnesses or related to witnesses. And I would inquire at this time, just out of an abundance of caution, have any others of you been approached by anybody wanting to discuss this case or anybody that you maybe identified as a relative of a witness or something of that nature?"

The trial court received no response from any of the jurors. The court then reiterated its admonishment to the jury:

"Remember every time you leave, I remind you not to talk to the people at the counsel table, witnesses about the case. And, again, many times any contacts are relatively harmless, but if someone sees you talking to someone, it could be misconstrued. (¶) So please, be very careful. When you are walking through the courthouse, be sure you keep your juror badge on. Even outside the environment of the Court, be very careful. Of course, remember not to read about the case in the newspapers or any other media of any kind. Please keep that in mind."

Defense counsel did not cross-examine Vasquez regarding the incident involving her husband and the two jurors.

### 2.     *There was no juror misconduct*

Armenta contends that "juror misconduct occurred when the two jurors spoke to Mr. Vasquez, who introduced one or both of the jurors to his wife, Mary Vasquez, a key prosecution witness." The record does not support Armenta's description of what occurred, or his conclusion that what occurred amounts to juror misconduct.

In general, juror misconduct occurs when there is a direct violation of the juror's oaths, duties, and instructions. (*In re Hamilton* (1999) 20 Cal.4th 273,

294; see also § 1122, subd. (b).)  Under section 1122, subdivision (b), jurors commit misconduct when they "converse among themselves, or with anyone else, on any subject connected with the trial, or . . . form or express any opinion thereon before the cause is finally submitted to them."

Armenta maintains that "the two jurors spoke to Mr. Vasquez, who introduced one or both of the jurors to his wife, Mary Vasquez." Armenta later describes the encounter in the following manner: "Here, Mary Vasquez accompanied her husband as he spoke to the two jurors. Also, he apparently introduced one or both of them to her, and she shook hands with them." Armenta contends that "the amiable contact between the jurors and a key prosecution witness amounts to juror misconduct." However, the record reflects that Mary Vasquez had no contact at all with jurors.

Both jurors were asked whether they had spoken with Mary Vasquez, and both jurors said that they had not. Although defense counsel claimed to have seen the witness's husband introduce her to the two jurors, the juror's responses to the court's questions and defense counsel's question contradict this claim. Both jurors very clearly denied having had any contact with Mary Vasquez.

Although the fact that Mary Vasquez's husband contacted two jurors is unfortunate, the husband was not a witness in the case and the jurors did not talk with him about the case. The jurors' brief interactions with the husband did not violate the instructions that the jurors had been given, and is not akin to the direct juror-witness conversations that were found to constitute juror misconduct in *People v. Ryner* (1985) 164 Cal.App.3d 1075 (*Ryner*), a case on which Armenta heavily relies.

In *Ryner*, seven jurors engaged in a hallway conversation with a police officer who was a prosecution witness, during a morning recess. The jurors and officer did not discuss the case or the officer's testimony, but rather, talked about sports and the officer's experiences on the police force and in the military. (*Ryner*, *supra*, 164 Cal.App.3d at pp. 1080-1081.) The *Ryner* court concluded that this conversation constituted juror misconduct.  [Footnote 8].

> FN8. The *Ryner* court ultimately determined that although the conversation between the jurors and the prosecution witness was misconduct, it was "so brief and innocuous that we regard it as trivial misconduct," and not prejudicial. (*Ryner*, *supra*, 164 Cal. App.3d at p. 1083.)

(*Id.* at p. 1083.) What occurred here is not like what occurred in *Ryner*. The two jurors in question in this case did not have contact or a conversation with a prosecution witness. Contrary to Armenta's contention, there is no evidence that "Vasquez had ingratiated herself to the jurors." We reject his assertion that juror misconduct occurred.

### 3.   *The trial court's inquiry into what occurred between the jurors, the witness, and the witness's husband was sufficient*

Armenta contends, in the alternative, that the trial court abused its discretion in not inquiring further into whether there was any contact between Mary Vasquez and the two jurors. Specifically, Armenta claims that "(t)he court abused its discretion by failing to conduct a thorough inquiry once it learned that potential misconduct had occurred and thereby (failing to) determine fully the

facts surrounding the interaction between Vasquez and the jurors." Armenta suggests that the trial court should have conducted a hearing pursuant to section 1120 regarding defense counsel's claim that he witnessed Mary Vasquez engaging with the jurors. Section 1120 provides:

> "If a juror has any personal knowledge respecting a fact in controversy in a cause, he must declare the same in open court during the trial. If, during the retirement of the jury, a juror declares a fact which could be evidence in the cause, as of his own knowledge, the jury must return into court. In either of these cases, the juror making the statement must be sworn as a witness and examined in the presence of the parties in order that the court may determine whether good cause exists for his discharge as a juror."

Armenta concedes that in this case, there is nothing that would indicate that any of the jurors possessed personal knowledge about the case, and that section 1120 does not specifically apply. However, Armenta relies on *People v. Burgener* (1986) 41 Cal.3d 505 (*Burgener*) overruled on other grounds in *People v. Reyes* (1998) 19 Cal.4th 743, 753-754, in which the Supreme Court ruled, "(O)nce the court is put on notice of the possibility a juror is subject to improper influences it is the court's duty to make whatever inquiry is reasonably necessary to determine if the juror should be discharged and failure to make this inquiry must be regarded as error. (Citation.)" (*Id.* at p. 520.) In *Burgener*, the jury foreman advised the trial court that one of the jurors appeared to be intoxicated during jury deliberations. (*Id.* at p. 519.) Because the trial court had the discretion under section 1123 to discharge a juror who was unable to perform his or her duty, the court also possessed the discretion to hold a hearing to "determine whether good cause to discharge the juror exists." (*Id.* at pp. 519-520.) A court that fails "to conduct a hearing sufficient to determine whether good cause to discharge the juror exists" abuses its discretion. (*Id.* at p. 520.)

Armenta complains that the procedure that the trial court utilized was inadequate because, although the court "did ask both jurors to relate what had transpired," the court "did not require either juror to testify under oath"; did not "ask the bailiff to relate what he had witnessed about the interaction, even though the officer acknowledged being 'out there when the whole thing with the jurors went down'"; and did not "inquire of either Mr. Vasquez or the witness herself, Mary Vasquez, and hear their account of the event." He complains that "(u)nder these circumstances, the court failed to make sufficient inquiry to determine the extent and nature of the contact between the jurors and Mr. and Mrs. Vasquez."

There is no support in the record or in the case law for Armenta's contention that the trial court was required to conduct a formal hearing, or that the court's inquiry was insufficient. "A court on notice of the possibility of juror misconduct must undertake an inquiry sufficient "'to determine if the juror should be discharged and whether the impartiality of other jurors had been affected."' (Citations.)" (*People v. Espinoza* (1992) 3 Cal.4th 806, 822.) "While a hearing with sworn testimony by the juror is required by section 1120, it appears that a less formal inquiry is adequate to determine 'good cause' to discharge a juror under other circumstances." (*People v. McNeal* (1979) 90 Cal.App.3d 830, 837.)

In this case, the trial court's inquiry was sufficient for the court to determine that the jurors had not engaged in misconduct. Although the jurors were not officially sworn before the court questioned them, the court had no reason to distrust what the jurors said in response to direct questioning. The court

had the opportunity to see the jurors and to judge their credibility. Based on this inquiry, the court determined that no misconduct had occurred. Under these circumstances, no additional inquiry was necessary.

Although Armenta complains that the trial court did not inquire of Mary Vasquez to get her version of what had occurred, the trial court clearly contemplated allowing defense counsel to question Vasquez about the incident during cross-examination, when she would have been under oath. The court gave defense counsel the opportunity to further explore "the nature of the contact between the jurors and Mr. and Mrs. Vasquez," but counsel apparently chose not to ask Vasquez about the incident involving the jurors on cross-examination. The trial court did not abuse its discretion by proceeding in this manner.

(Lodgment No. 8, <u>People v. Armenta</u>, D054071, slip op. at 12-24.)

Clearly established federal law provides that: "The Sixth Amendment guarantees criminal defendants a verdict by impartial, indifferent jurors." <u>Estrada v. Scribner</u>, 512 F.3d 1227, 1239 (9th Cir. 2008), citing <u>McDonough Power Equipment, Inc. v. Greenwood</u>, 464 U.S. 548, 554 (1984) and <u>Smith v. Phillips</u>, 455 U.S. 209, 217 (1982). Bias can be "actual bias," which is "the existence of a state of mind that leads to an inference that the person will not act with entire impartiality," or "implied bias," where, in extraordinary cases, bias may be presumed from the surrounding circumstances. <u>Scribner</u>, 512 F.3d at 1240. The presence of a biased juror is structural error not subject to harmless error analysis. <u>Id.</u>

There is no evidence in the record demonstrating that either juror lost the ability to be impartial simply by speaking briefly to the husband of a witness regarding matters unrelated to the trial. And this is not a case where the circumstances were so extraordinary that bias can be presumed. Rather, it was a chance encounter between two jurors and the husband of a witness whose testimony takes up less than 40 pages of a trial transcript more than 3000 pages long. (<u>See</u> RT 1679-1717.) In addition, Mary Vasquez was an ancillary witness who merely testified that she saw Petitioner earlier in the day near the house where the shooting later took place, that she knew Petitioner as a member of a gang rival to the gang on whose territory the shooting took place, and that she gave victim Hernandez a ride after he had been shot but was unaware that he was wounded at the time she gave him a ride. (RT 1679-90.) Petitioner argued in the state supreme court, although he does not repeat the argument here, that the state court erred in finding that a sufficient inquiry into the matter had been made because the trial court never

questioned Vasquez, her husband, or the bailiff about the contact. (Lodgment No. 9 at 13-15.) Petitioner also contended that the appellate court's finding that his trial counsel could have questioned Vasquez himself on cross-examination did not take into consideration that it would alienate the jurors if counsel had challenged Vasquez in front of them, and that a hearing outside the presence of the jury by the trial judge was therefore necessary. (Id.) Both arguments rely on speculation that something took place other than what the jurors said took place. The record indicates that the contact amounted only to an innocuous, chance conversation unrelated to the trial, and Petitioner has established no basis to support his contention that additional inquiry was necessary in order to determine if the jurors were biased in favor of the witness. "The determination of whether a juror is actually biased is a question of fact, and thus accorded deference under 28 U.S.C. § 2254." Scribner, 512 F.3d at 1240. Petitioner has failed to demonstrate that the state court's finding of no bias was objectively unreasonable.

Accordingly, the Court finds that the state court's adjudication of claim four did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Richter, 131 S.Ct. at 786-87; Andrade, 538 U.S. at 75-76; Miller-El, 537 U.S. at 340; Williams, 529 U.S. at 412; Scribner, 512 F.3d at 1240. The Court therefore recommends habeas relief be denied as to claim four.

**E.     Claim 5**

Petitioner contends in claim five that he was denied his Sixth and Fourteenth Amendment right to the effective assistance of counsel because his trial counsel failed to seek removal of the juror who knew the husband of prosecution witness Vasquez. (Pet. at 11.) Respondent contends that Petitioner has failed to present evidence that the juror was actually biased or acted inappropriately, and therefore the state supreme court's silent denial of the claim was objectively reasonable. (Ans. Mem. at 17, 21.)

Petitioner presented claim five to the state supreme court in a habeas petition which was summarily denied. (Lodgment No. 11 at 48-49; Lodgment No. 12.) The claim was not raised in the lower state courts, and this Court must therefore conduct an independent review of the

1   record.  Pirtle, 313 F.3d at 1167; Greene, 288 F.3d at 1089.  The state appellate court addressed

2   a related issue just discussed with respect to claim four, where it found that the trial court

3   conducted an adequate inquiry into whether the two jurors who conversed with Vasquez'

4   husband should have been excused as a result of the contact.  The Court will look to the

5   appellate court's reasoning in examining this related claim.  See Frantz v. Hazey, 533 F.3d 724,

6   738 (9th Cir. 2008) (en banc) (holding that where the reasoning of the state court is relevant to

7   resolution of the constitutional issue, that reasoning must be part of a federal habeas court's

8   consideration even under an independent review).

9        As quoted above, the state appellate court found that the trial "court had the opportunity

10  to see the jurors and to judge their credibility.  Based on this inquiry, the court determined that

11  no misconduct had occurred.  Under these circumstances, no additional inquiry was necessary."

12  (Lodgment No. 8, People v. Armenta, D054071, slip op. at 23.)  The appellate court also noted

13  that "the trial court clearly contemplated allowing defense counsel to question Vasquez about

14  the incident during cross-examination, when she would have been under oath.  The court gave

15  defense counsel the opportunity to further explore 'the nature of the contact between the jurors

16  and Mr. and Mrs. Vasquez,' but counsel apparently chose not to ask Vasquez about the incident

17  involving the jurors on cross-examination."  (Id. at 23-24.)

18       Although Petitioner contends his counsel should have requested removal of the juror

19  based on the fact that the juror was friends with the husband of the prosecution witness,

20  Petitioner does not support that contention.  (See Pet. at 11.)  Conclusory allegations which are

21  not supported by specific facts are insufficient to warrant federal habeas relief.  James v. Borg,

22  24 F.3d 20, 26 (9th Cir. 1994).  In the state habeas proceedings Petitioner argued that no one had

23  asked the juror if he could remain impartial given the fact that his friend's wife was testifying

24  for the prosecution, and that there was no tactical reason for counsel to fail to do so or to seek

25  the juror's removal.  (Lodgment No. 11 at 49.)  However, the record does not support a finding

26  that Petitioner's counsel was deficient in failing to inquire of the juror or in failing to request his

27  dismissal.  Petitioner has failed to make a showing of deficient performance or prejudice, either

28  here or in the state court.  See Strickland, 466 U.S. at 687.

Accordingly, the Court finds that the state court's adjudication of claim five did not involve an unreasonable application of clearly established federal law. <u>Richter</u>, 131 S.Ct. at 786-87; <u>Padilla</u>, 130 S.Ct. at 1485; <u>Andrade</u>, 538 U.S. at 75-76; <u>Miller-El</u>, 537 U.S. at 340; <u>Williams</u>, 529 U.S. at 412; <u>Strickland</u>, 466 U.S. at 687.  The Court therefore recommends denying habeas relief as to claim five.

**F.     Claim 3**

Petitioner contends in claim three that he was denied his Sixth and Fourteenth Amendment right to the effective assistance of counsel because his appellate counsel failed to argue on appeal that his trial counsel was ineffective for failing to seek removal of the juror who was friends with the husband of prosecution witness Mary Vasquez. (Pet. at 10.) Petitioner also argues that his appellate counsel failed to fully exhaust his federal claims in state court because he did not argue the federal aspects of the claims arising from the juror misconduct. (<u>Id.</u>) Respondent inexplicably contends that Petitioner has abandoned claim three.[3] (Ans. Mem. at 6.)

Petitioner presented claim three to the state supreme court in a habeas petition which was summarily denied. (Lodgment No. 11 at 40-42; Lodgment No. 12.)  The claim was not raised in any lower state court, and this Court must therefore conduct an independent review of the record.  <u>Pirtle</u>, 313 F.3d at 1167; <u>Greene</u>, 288 F.3d at 1089.  As set forth above, the state appellate court addressed a related issue, and the Court will look to that court's reasoning in examining this claim.  <u>Frantz</u>, 533 F.3d at 738.

Claims of ineffective assistance of appellate counsel are reviewed under the <u>Strickland</u> standard.  <u>Bailey v. Newland</u>, 263 F.3d 1022, 1028 (9th Cir. 2001).  "A petitioner [is] not prejudiced by appellate counsel's decision not to raise issues that had no merit." <u>Featherstone v. Estelle</u>, 948 F.2d 1497, 1507 (9th Cir. 1991); <u>see also</u> <u>Gustave v. United States</u>, 627 F.2d 901, 906 (9th Cir. 1980) ("There is no requirement that an attorney appeal issues that are clearly untenable.").

---

[3]  Respondent cites to footnote 13 on page 45 of the Petition to support this contention. (Ans. Mem. at 6.)  However, the Petition has no footnote 13 and no page 45. (<u>See</u> ECF No. 1.)

As set forth above, Petitioner has failed to demonstrate any error by his trial counsel in failing to request the juror be excused.  Petitioner is therefore unable to demonstrate that his appellate counsel rendered constitutionally ineffective assistance in failing to present such a claim on appeal.  Bailey, 263 F.3d at 1028; Featherstone, 948 F.2d at 1507; Gustave, 627 F.2d at 906.  In addition, Petitioner was not prejudiced by appellate counsel's failure to present the claim on appeal or to federalize it, because Petitioner succeeded in having the federalized claim adjudicated on its merits in the state supreme court in his habeas proceeding, and because, as set forth above, it is without merit.

The Court finds that the state court's adjudication of claim three did not involve an unreasonable application of clearly established federal law.  Richter, 131 S.Ct. at 786-87; Padilla, 130 S.Ct. at 1485; Andrade, 538 U.S. at 75-76; Miller-El, 537 U.S. at 340; Williams, 529 U.S. at 412; Strickland, 466 U.S. at 687; Bailey, 263 F.3d at 1028; Featherstone, 948 F.2d at 1507.  The Court therefore recommends denying habeas relief as to claim three.

**G.   Claim 6**

Petitioner contends in claim six that he was denied his Fifth, Sixth and Fourteenth Amendment rights to due process and a fair trial because the trial court allowed admission of evidence that Petitioner had a conviction for street terrorism. (Pet. at 11.) He contends the prior crime, which involved shooting at rival gang members, was highly prejudicial because it was so similar to the charged offense, and that it lacked significant probative value because it was admitted to rebut Petitioner's contention that he had left the gang, but was cumulative to evidence of when he left the gang.  (Id.)

Respondent contends that the state court's denial of the claim, on the basis that the conviction was admissible to rebut Petitioner's contention that he had left the gang and was not cumulative to other evidence, did not violate clearly established federal law.  (Ans. Mem. at 8-10.)  Respondent also contends that any error was harmless.  (Id.)

Petitioner presented claim six to the state supreme court in a habeas petition which was summarily denied. (Lodgment No. 11 at 49-52; Lodgment No. 12.)  A similar claim relying on the same facts but presenting only a question of state law, i.e. whether it was an abuse of

discretion for the trial judge to admit the evidence, was presented to the state supreme court in the petition for review, which was summarily denied. (Lodgment No. 9 at 23-26; Lodgment No. 10.) When this claim was presented to the state appellate court, however, it was presented in terms of a federal constitutional violation. (Lodgment No. 5 at 86.) Thus, the Court will look though the silent denial by the state supreme court on state habeas to the appellate court opinion on direct appeal, which stated:

> Armenta contends that the trial court abused its discretion under Evidence Code section 352 in allowing the prosecution to present evidence that Armenta had been convicted of street terrorism for an offense that occurred in October 2001 - the month after the charged shooting occurred. In the alternative, Armenta claims that the court erred in "refusing to exclude the evidence as a sanction after a prosecution witness described the underlying conduct as involving a 'shooting' in violation of a court order sanitizing the prior conviction evidence."

> 1.   *Additional factual background*

> Prior to trial, defense counsel moved to exclude evidence related to Armenta's conviction for street terrorism. Defense counsel argued that the prior felony could not be used to impeach Armenta because Armenta did not intend to testify, and that it could not be used as evidence of a predicate offense to prove the criminal street gang allegations, because the offense was not one of the offenses specified under section 186.22, subdivision (e), and also because it occurred after the charged offense. The prosecutor argued that the evidence was admissible to rebut an anticipated defense argument that Armenta was no longer a member of the Chicali gang at the time of the charged offenses. The court tentatively ruled that evidence of the street terrorism offense was admissible, but stated that the court would continue to think about it.

> During trial, outside the presence of the jury, the court and counsel discussed defense counsel's renewed objection to evidence of Armenta's conviction for street terrorism. Defense counsel argued that evidence of this conviction would be unduly prejudicial because the jury would be likely to rely on the conviction to conclude that Armenta was a gang member at the time of the charged offense rather than use it to weigh his credibility, which, in defense counsel's view, was the only proper basis for admitting this evidence. Counsel also argued that the street terrorism conviction could not constitute a "predicate offense because it occur(red) after the offense of September 15th or 16th of 2001." If the court was not inclined to exclude the evidence, defense counsel offered as an alternative that the court limit what the expert could say about the crime to the "fact that it was an adjudication against Mr. Armenta in 2003."

> The trial court indicated that it would allow the prosecutor to elicit from the expert information about the conduct underlying the conviction only to the extent that it "would indicate that (Armenta) is a Chicali gang member." After further discussion as to what would and would not be allowed, defense counsel asked, "Are we going to get into the fact that this is a drive-by shooting?" The court responded, "I don't think so. I don't know that that has anything to do with the fact he was with Chicali members and was associating with Chicali members." The prosecutor objected to not being able to provide information about the

underlying conduct.  Defense counsel suggested, "(W)e can tell them that (street terrorism) is what he was convicted of."   The trial court agreed with this suggestion, saying:

> "That would - I think that might work.  He was convicted and pled guilty to street terrorism while he was associating with Chicali members and the street terrorism was directed at members of the Broleno gang.  I think that that would show that . . . as of October he was still related and associated with the Chicali gang.  And I think that that would probably - because that is the crime that was being - he pled guilty to.  I think that would, although it might take some of the teeth out, it would still show he is still associating with that gang."

The court ultimately ruled that the prosecutor would be permitted to elicit testimony about the fact that Armenta had engaged in "terrorist acts directed at another gang by the Chicali gang."

At some point during the direct examination of gang expert Monita, the prosecutor asked Monita about an incident in October 2001 that involved Armenta that Monita believed was gang-related.  When the prosecutor asked Monita to explain generally what that incident was, Armenta's attorney made an unspecified objection.  The court noted the objection and overruled it.  Monita then said, "October 15th at about 11 (minutes) after 8:00 p.m., we received a call of a shooting."  The prosecutor immediately said, "Excuse me, Your Honor.  May I approach the witness?"  The court said, "Yes. Please do."  Defense counsel then asked for a sidebar conference.

At the sidebar conference, the prosecutor told the court that she had admonished Monita not to mention anything about a shooting, and that she thought "he forgot" because she had "told him when he first got here."

The trial court decided to advise the jury to disregard Monita's statement, and noted that "the nature of the incident is really not critical and hopefully that unrings it."  When defense counsel complained, "They still heard the fact that he was involved in a shooting," the court said, "(They heard) (t)hat he responded to a shooting.  They won't know if it was proven in court, that was the plea.  They won't know if there was a shooting.  There wasn't a shooting.  It was firecrackers, exhaust.  I'll tell them to disregard it."

Defense counsel then asked the court to impose a sanction in the form of not allowing Monita to testify about Armenta's prior conviction for street terrorism at all.  The court said, "I don't think it warrants any real action on the part of the Court other than to advise the jury to disregard it."

The court proceeded to admonish the jury as follows:

> "Ladies and gentlemen, (the prosecutor) asked a question that has been partially responded to by the witness, he started.  What I'm going to ask you to do is disregard the first part of the witness's(s) comments, the reason he responded.  That is not really relevant to the issue we're going to be covering here.  That information that was just received by the jury, maybe some of you didn't hear it, which is good, because I'm going to tell you to please disregard that.  (¶)  But let me note that at this point the reason for their

responding wasn't critical. You will find out what happened, what the result of the investigation was. Treat that comment as something that wasn't necessarily proven, that could have been anyone, a number of different things. Again, the reason for their initially responding isn't of import with respect to this line of questioning. Please disregard the first part of the comment."

Monita went on to testify that he had arrested Armenta and two other Chicali gang members for a crime of violence against Brole gang members, that Armenta was convicted of street terrorism for the offense, and that Monita believed that the crime was "gang-related."

> ### 2. *The trial court did not abuse its discretion under section 352 in admitting Armenta's felony conviction for street terrorism*

Armenta contends that the trial court's admission of evidence of his conviction for street terrorism was an abuse of discretion. According to Armenta, the evidence was "highly prejudicial because the prior offense was essentially identical to the street gang special circumstance and enhancement allegations . . . and involved conduct, shooting at gang rivals, similar to the charged offense." Armenta asserts that the evidence "lacked significant probative value since it was admitted solely to contradict Armenta's claim that he had quit the Chicali gang before the charged offense occurred." Under Armenta's view of the evidence, the evidence of his conviction for street terrorism was "cumulative to other evidence showing his gang membership at that time."

We conclude that the trial court did not abuse its discretion under Evidence Code 352 in allowing the prosecutor to introduce evidence of Armenta's street terrorism conviction. Armenta presented evidence in the form of expert opinion that although he had previously been a member of the Chicali gang, by the time of the shooting in September 2001, he was no longer affiliated with the gang. Evidence that a mere month after the Garcia/Hernandez shooting took place Armenta was not only involved in gang violence, but was convicted as a result of that conduct, specifically rebutted Armenta's contention that he had given up his affiliation with the gang years before the shooting took place.

Armenta asserts that there was abundant other evidence that he was in the Chicali Brasas gang at the time of this shooting, including Monita's testimony that Armenta "was responsible for forming the Chicali Brasas gang . . . and that a source in the gang, Manuel Espinosa, considered [Armenta] a 'prime mover' and 'hardcore member' in 2002 or 2003." Armenta points out that other witnesses, such as Villa, suggested that Armenta was in the gang at the time of the shooting, and that a probation report from January 2003 stated that he was a "Chicali 13 member." However, none of this evidence is similar to the evidence of his conviction for a gang crime. Evidence of the street terrorism conviction was highly relevant, particularly once Armenta elected to introduce his expert's opinion that he had dropped out of the gang.

Further, the trial court ruled that the prosecution would not be allowed to mention the fact that the street terrorism conviction was based on a shooting incident, thereby minimizing the potential that the jury would use the fact of the street terrorism conviction for a purpose other than simply as evidence that Armenta was still involved with the Chicali gang in late 2001, despite his claims to the contrary. The court acted well within its discretion in determining that the

probative value of this evidence outweighed any prejudice that might result from its admission.

3. *The trial court did not err in refusing to exclude the evidence of Armenta's conviction as a sanction*

Armenta contends that even assuming that the trial court did not abuse its discretion in initially deciding to admit evidence of the street terrorism conviction, the court erred in failing to exclude this evidence once Monita referred to the underlying conduct supporting the conviction as a "shooting," in violation of the trial court's ruling that the prosecutor and witness were not to discuss the underlying facts of the street terrorism conviction.

Before the prosecutor questioned Monita regarding the prior conviction, the trial court had concluded that evidence that Armenta had committed "street terrorism . . . directed at members of the Broleno gang" would be sufficient to establish that Armenta was still involved with the gang in late 2001, and that it was not necessary to discuss whether the crime involved a shooting. However, when the prosecutor asked Monita about a gang-related incident in October 2001 involving Armenta, Monita began his answer by saying that the police had "received a call of a shooting."

It appears clear that the trial court wanted to avoid any mention of the facts underlying the street terrorism charge, and that Monita's response to the prosecutor's question should not have included the nature of the call to which officers responded. Armenta frames the issue as involving "the revelation that Armenta's prior conviction had involved a gang-related 'shooting,'" which, he contends, "went directly to the main issue of the case: whether he had conspired with Gastelum to commit the gang-related shooting that had resulted in Garcia's death." Although Monita should not have mentioned the word "shooting" in his response to the prosecutor's question, what he said did not equate to a "revelation that Armenta's prior conviction had involved a gang-related 'shooting.'" Rather, Monita said that officers received a call about a "shooting." He was immediately prevented from saying anything further. Monita never testified that a shooting had in fact occurred, or that Armenta's conviction involved a shooting incident. Further, the trial court immediately admonished the jury that "the reason (f)or their (i.e., the officers) responding wasn't critical" and told jurors to disregard Monita's statement as to the reason officers responded that day. As the court told the jury, "You will find out what happened, what the result of the investigation was. Treat that comment as something that wasn't necessarily proven, that could have been anyone, a number of different things."

Armenta contends that the trial court's admonition was insufficient and ineffective, and could not have cured the prejudice that resulted from Monita's mentioning a shooting. He cites the following language in *People v. Hardy* (1948) 33 Cal.2d 52, 61 (*Hardy*) in support of this contention:

"'It has . . . been held that in certain cases where the incompetent evidence goes to the main issue and where the proof of defendant's guilt is not clear and convincing, that the error in admitting the incompetent evidence cannot be cured by striking out and instructing the jury to disregard that evidence.'"

*Hardy* was quoting *People v. McKelvey* (1927) 85 Cal.App. 769, 771 - a case in which the trial court allowed five witnesses "to testify to defendant's bad

moral character, although he had not put his character in issue." (*Hardy*, supra, 33 Cal.2d at p. 62.)  In *Hardy*, the evidence being challenged was what the court viewed as "a confession [by the defendant] for which no foundation had been laid." (*Id*. at p. 61.)  The trial court had allowed a deputy to testify as to what the defendant had said, but then determined that the evidence should not have been admitted because no proper foundation had been laid.  However, in instructing the jury that the deputy's testimony "was expunged from the record" and that it was not to consider that evidence, the court re-read the very same testimony to the jury a second time. (*Ibid*.)  Under those circumstances, the *Hardy* court found that "it was extremely unlikely that the jury could wholly reject the evidence and completely disregard it in their deliberations." (*Id*. at p. 62.)

The evidence at issue in this case is not of the same type as the erroneously admitted evidence discussed in *Hardy* or *McKelvey*.  In addition, the other evidence of Armenta's guilt was significant and convincing.  Further, the court in this case provided the jury with a reason why it should ignore Monita's description of the call, telling the jury that it had not been proven and could have been "a number of things," and informing them that the reason for the call was irrelevant. This, combined with the court's clear admonition that the jury was to disregard Monita's reference to the type of call that officers had received, sufficiently cured any problem that Monita's description of the call as being one about a shooting may have raised.

(Lodgment No. 8, <u>People v. Armenta</u>, D054071, slip op. at 38-46.)

As set forth above in the discussion of claim one, the Ninth Circuit has held that because the Supreme Court in <u>McGuire</u> specifically reserved ruling on the issue regarding whether introduction of propensity evidence can give rise to a federal due process violation, and has denied certiorari at least four times on the issue since <u>McGuire</u> was decided, the right asserted "has not been clearly established by the Supreme Court, as required by AEDPA." <u>Alberni</u>, 458 F.3d at 867.  Thus, to the extent Petitioner alleges that introduction of the evidence of the prior conviction was a violation of federal due process because it unfairly permitted the jury to find that he had a propensity to commit a similar crime to the ones with which he was charged, the state court's adjudication of the claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law. <u>Lockyer</u>, 538 U.S. at 75-76; <u>Williams</u>, 529 U.S. at 405-07; <u>Alberni</u>, 458 F.3d at 867.

Assuming Petitioner could demonstrate that a federal constitutional error occurred as a result of the admission of the prior conviction, the Court must still determine whether the error was harmless. <u>Fry</u>, 551 U.S. at 119.  Habeas relief is not available unless the error resulted in

a "substantial and injurious effect or influence in determining the jury's verdict," or the court "is in grave doubt" about whether the error was harmless. <u>Medina</u>, 386 F.3d at 877; <u>Brecht</u>, 507 U.S. at 637; <u>O'Neal</u>, 513 U.S. at 436.

Petitioner argues the error affected the jury's determination because it permitted the jury to impermissibly infer that because he had been convicted of a gang-related shooting a month after the gang-related shooting for which he was on trial, he was guilty of committing the charged offense. As summarized above in relation to claim one, however, there was strong evidence presented against Petitioner by his friends and fellow gang members, which included admissions by Petitioner and Gastelum that they were responsible for the shooting. The victim who survived the shooting, Hernandez, positively identified Gastelum as the shooter, and evidence was presented that Petitioner was with Gastelum when the shooting took place. In addition, as quoted above in the appellate court opinion, the jurors were instructed to disregard the comment regarding the shooting. (<u>See</u> RT 1821-22.) Jurors are presumed to follow their instructions. <u>Richardson v. Marsh</u>, 481 U.S. 200, 211 (1987). The Court is not in grave doubt whether the erroneous admission of evidence that Petitioner was convicted of street terrorism involving gangs which was based on an incident to which the police responded to a call that a shooting had taken place, had a substantial effect or influence on the jury's verdict.

Accordingly, the Court finds that the state court's adjudication of claim six was neither contrary to, nor involved an unreasonable application of, clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. <u>Richter</u>, 131 S.Ct. at 786-87; <u>Andrade</u>, 538 U.S. at 75-76; <u>Miller-El</u>, 537 U.S. at 340; <u>Williams</u>, 529 U.S. at 412. The Court also finds that any constitutional violation was clearly harmless. <u>Medina</u>, 386 F.3d at 877; <u>Brecht</u>, 507 U.S. at 637; <u>O'Neal</u>, 513 U.S. at 436. The Court therefore recommends denying habeas relief as to claim six.

## VI.

## <u>CONCLUSION AND RECOMMENDATION</u>

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing

that Judgment be entered denying the Petition.

**IT IS ORDERED** that no later than **February 8, 2013**, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **February 22, 2013.**  The parties are advised that failure to file objections with the specified time may waive the right to raise those objections on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

DATED: January 23, 2013

_____
Hon. William McCurine, Jr.
U.S. Magistrate Judge
United States District Court