1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10
11

RICHARD ARMENTA,

CASE NO. 11cv2577 WQH (WMC)

12

Petitioner,

13

vs.

ORDER

KELLY HARRINGTON, Warden,

14

Respondent.

15

HAYES, Judge:

16

    The matter before the Court is the Report and Recommendation (ECF No. 24) of

17

United States Magistrate Judge William McCurine, Jr. recommending that the Court

18

deny Petitioner Richard Armenta's Petition for Writ of Habeas Corpus (ECF No. 1).

19

**BACKGROUND FACTS[1]**

20

    At around nine or ten o'clock in the evening of September 15, 2001, Francisco

21

Hernandez arrived at a house party on B Street in Brawley, California. Members of the

22

"Brolenos" gang were among the party's guests. Hernandez was in the front yard of the

23

house later in the night when a man approached him from the street and said "come

24

here," indicating that he wanted Hernandez to open the gate to the yard. Believing the

25
26

    [1]The Court recites these facts according to the factual findings of the California Court of Appeal, (Lodgment 8 at 5-6, ECF No. 16-40), which Petitioner does not dispute. *See* 28 U.S.C. § 2254(e)(1) (a presumption of correctness attaches to state court determinations of factual issues).

27
28

man to be a friend, Hernandez complied.  The man then pulled out a handgun and "opened fire."  Hernandez was shot in the back as he ran towards the house.  Once inside, Hernandez hid behind a refrigerator, unaware that he had been shot until he saw blood "pouring out of" his back.

When the shooting ended, Hernandez found his friend, 16-year old Jesse Garcia, lying on the floor near the front door of the home, bleeding from a gunshot wound to his forehead.  Hernandez left the scene because he had an outstanding arrest warrant, and called Mary Vasquez, a friend's mother, to pick him up at a house down the block. Police and paramedics soon arrived at the scene of the shooting.  Garcia was transported to a hospital, where he remained in a coma for three months until he died on December 18, 2001.  Garcia did not belong to a gang.  Hernandez refused to cooperate with the police after he checked himself into the hospital.

No arrests were made in connection with the shooting for over five years.

## PROCEDURAL HISTORY

### I.    State Proceedings

On January 11, 2007, Petitioner and Jesus Gastelum were charged in a second amended information with murder[2] and conspiracy to commit murder[3] for their involvement in the September 15, 2001 shooting.  (Lodgment 3, Volume 1, Part 1 at 100-03, ECF No. 16-30).  The information contained a special circumstance allegation that Petitioner and Gastelum intentionally killed Garcia while actively participating in a criminal street gang.[4]  *Id.* at 104.  The amended information also alleged that the crimes were committed for the benefit of a criminal street gang;[5] that a principal to the conspiracy personally used a firearm, personally discharged a firearm, and personally

---

[2]Violation of California Penal Code section 187(a).

[3]Violation of California Penal Code sections 182(a)(1) and 187(a).

[4]Violation of California Penal Code section 190.2(a)(22).

[5]Violation of California Penal Code section 186.22(b)(1)(C).

discharged a firearm causing great bodily injury and death;[6] and that Gastelum had suffered a prior serious or violent felony conviction. *Id.* at 104-05.

On December 6, 2007, an Imperial County Grand Jury returned an amended indictment charging Petitioner and Gastelum with attempted murder and conspiracy to commit murder. (Lodgment 2, Volume 2, Part 1 at 388-91, ECF No. 16-32). The attempted murder charge, which was based on Hernandez's injury, was subsequently dismissed on statute of limitations grounds. (Lodgment 1, Volume 9 at 713-17, ECF No. 16-9). The two-count information and the amended indictment were consolidated. *Id.*

### A.    Trial Proceedings

On June 11, 2008, the trial for Petitioner and Gastelum commenced. Petitioner and Gastelum were tried jointly by a single jury. *Id.* at 716.

#### 1.    Prosecution Witnesses

The prosecution introduced evidence that Petitioner and Gastelum were members of the "Chicali Brasas 13" ("Chicali Brasas") gang; that Petitioner went by the gang moniker "Widget;" and that Gastelum went by the gang moniker "Pookie." (Lodgment 1, Volume 10 at 818-20, ECF No. 16-10).

Daniel Villa Castillo (referred to as "Villa") testified that he went to Petitioner's house on the night of the shooting to buy drugs. *Id.* at 821-23. Villa testified that he and Petitioner drove Petitioner's car down B Street and noticed members of the rival "Brolenos" gang at a house party. *Id.* at 823-25. Villa testified that Petitioner asked him whether he would shoot someone at the house if Petitioner gave him a gun, and that Villa did not respond to Petitioner's question. *Id.* at 826-27. Villa testified that, upon returning to Petitioner's house, Petitioner told everyone in the room – including Gastelum, Petitioner's brother, and a third person who Villa believed went by the gang moniker "Ghost" – that Brolenos gang members were at a party on B Street. *Id.* at 827-

---

[6]Violation of California Penal Code sections 12022.5(a)(1) and 12022.53(b), (c), (d), (e)(1).

28.  Villa testified that Petitioner asked if anyone would volunteer to do a shooting at the party, and that Gastelum responded by saying that "he was going to do the job for his gang." *Id.* at 828.  Villa testified that Petitioner retrieved a handgun from a hiding place inside a speaker, at which point Gastelum cleaned the gun, someone else cleaned bullets for the gun, and Petitioner loaded the gun. *Id.* at 829, 831.  Villa testified that Gastelum took the gun and "put it on his belt," *id.* at 830, and that Petitioner and Gastelum left the house together in a Toyota Camry owned by Petitioner's mother. *Id.* at 834.  Villa testified that he and others listened to a police scanner in Petitioner's room, and eventually heard a police report about a shooting on B Street. *Id.* at 835-36. Villa testified that Petitioner and Gastelum returned to Petitioner's house a few minutes later and "were, like, very anxious, happy that they had done something.... Something good." *Id.* at 836.  Villa testified that Gastelum said he had gotten out of the car, knocked on the door at the house party, and shot the person who answered the door in the head as he said, "Puto, Chicali Brasas." *Id.* at 837.  Villa testified that Gastelum said he fired three or four more bullets, and thought he hit someone else. *Id.* at 837-38. Villa testified that he did not immediately go to the police because he feared for his life and the lives of his family. *Id.* at 840. Villa testified that he decided to write two letters to the FBI while he was in prison in 2003 because he "decided to do the right thing." *Id.* at 841.

Joseph Somenek, an investigator with the California Department of Justice, testified that he had worked on the Jesse Garcia murder case since 2005. (Lodgment 1, Volume 11 at 1017, ECF No. 16-11).  Somonek testified that Villa picked Petitioner and Gastelum out of lineups at the Imperial County Jail on August 31, 2006. *Id.* at 1023-26.

Israel Salazar, who went by the gang moniker "Chivo," testified "in exchange for complete immunity." (Lodgment 1, Volume 12 at 1074, ECF No. 16-12).  Salazar testified that he had been a member of the Chicali Brasas gang for 14 years, but that he left the gang roughly two years prior to Petitioner's trial. *Id.* at 1074.  Salazar testified

that Petitioner and Petitioner's girlfriend came to visit him several hours before the September 15, 2001 shooting, (Lodgment 1, Volume 13 at 1192, ECF No. 16-13), and that Petitioner asked whether he would accompany him to a Brolenos gang party to "blast them," i.e. "shoot" them. (Lodgment 1, Volume 12 at 1083). Salazar testified that Petitioner said he was going to visit Pete Castellanos, a fellow Chicali Brasas gang member who was paralyzed as a result of being shot by a Brolenos gang member, before carrying out the shooting on B Street. *Id.* at 1084-85. Salazar testified that Petitioner had said in the past that "somebody had to pay back" for the Castellanos shooting. *Id.* at 1085. Salazar testified that Petitioner came to Salazar's house a few hours later, gave Salazar a gun that he instructed him to hide, *id.* at 1092-93, and told Salazar that "some shit went down on B Street." *Id.* at 1086-87. Salazar testified that he later spoke to Petitioner about the shooting and was told that Gastelum was the shooter. *Id.* at 1089. Salazar testified that he spoke with Petitioner in the Imperial County Jail in 2006 during a chance encounter, and that Petitioner had asked him not to testify against him because "this shit is serious and [Petitioner and Gastelum] are facing life." *Id.* at 1098-1100.

Luis Alberto Santoyo, another Chicali Brasas gang member, testified that he was at Petitioner's house in April 2005 with Gastelum, Petitioner, and Petitioner's brother. (Lodgment 1, Volume 13 at 1037, 1043-44, ECF No. 16-13). Santoyo testified that Petitioner said someone had been speaking to the police about the gun used in the shooting, and that Petitioner told Santoyo that someone named "Santos" had taken the gun to Mexico. *Id.* at 1245. Santoyo testified that Gastelum once told him that Gastelum was approached by an individual in jail who mentioned that the Jesse Garcia murder was a drive-by shooting – the type of shooting forbidden by imprisoned gang leaders, also known as "shot callers," because of the potential for innocent victims. *Id.* at 1247-50. Santoyo testified that Gastelum said he corrected this individual, telling him the shooting was not a drive-by, and that he had carried it out. *Id.* at 1249. Santoyo testified that he met Petitioner in jail in December of 2007 and that Petitioner

asked Santoyo not to testify against him.  *Id.* at 1253.  Santoyo testified that, while he was in jail, he received a letter from Petitioner dated January 9, 2008, in which Petitioner asked Santoyo not to testify.  (Lodgment 1, Volume 14 at 1340-44, ECF No. 16-14).  Santoyo testified that he recognized Petitioner's handwriting on the letter.  *Id.* at 1340.

Francisco Hernandez testified that he was shot in the back by an individual who approached the house on B Street.  *Id.* at 1373-74.  Hernandez testified that the individual who shot him was present in court, and then identified Gastelum as the shooter.  *Id.* at 1375-76.  Hernandez testified that after he was shot, he ran into the house and behind a refrigerator and noticed blood "pouring out of [his] back."  *Id.* at 1376.  Hernandez testified that when he decided to leave the house, he noticed his friend, Jesse Garcia, laying on the floor with blood "pouring" from his head "like a water fountain."  *Id.* at 1377.  Hernandez testified that he called Mary Vasquez, a friend's mother, and asked her to pick him up "three, four houses down" from the shooting.  *Id.* at 1379.  Hernandez testified that he went to the hospital about an hour after being shot.  *Id.* at 1380.  Hernandez testified that he refused to cooperate with the police because he was afraid of retaliation, *id.* at 1381, and did not want to be known as a snitch.  *Id.* at 1384.  Hernandez testified that Salazar was his cellmate in jail at some point after the shooting, and that Salazar told Hernandez that Petitioner brought the gun to Salazar's house.  Hernandez testified that Salazar told him that Petitioner later returned to retrieve the gun.  *Id.* at 1396-98.

During a break in Hernandez's testimony, counsel for Petitioner told the Court that he had observed Vasquez, the next scheduled witness, communicating with two jurors outside the courtroom.  (Lodgment 1, Volume 15 at 1528, ECF No. 16-15).  After holding a hearing on the matter, the court determined that the jurors had been approached by Vasquez's husband, a casual acquaintance of one juror, that the case had not been discussed, and that the encounter was harmless.  *Id.* at 1529-36.  The court denied Petitioner's request to prohibit Vasquez from testifying.  (Lodgment 1, Volume

16 at 1664-78, ECF No. 16-16).

Vasquez testified that her sister lives near the house on B Street where the shooting occurred, and that she had seen Petitioner driving near her sister's house a few hours before the shooting. *Id.* at 1679-84. Vasquez testified that her son and nephew were members of the Broleno gang. *Id.* at 1685. Vasquez testified that she approached Petitioner when he got out of his car and told Petitioner that she was worried about his presence in a Broleno gang neighborhood. *Id.* at 1686-87. Vasquez testified that Petitioner told her: "Don't worry. I'm not doing anything. I just stopped to take a piss." *Id.* at 1687. Vasquez testified that Hernandez called her later in the night and asked to be picked up at Vasquez's sister's house on B Street. *Id.* at 1690. Vasquez picked Hernandez up and drove him to a friend's house. *Id.*

Jose Soto, a Special Agent for the California Department of Justice, testified that he had worked on the Jesse Garcia murder since September 2001. *Id.* at 1588. Soto testified that he was informed by Brawley Police Detective Greg Heath that Salazar had called the Brawley Police Department on September 18, 2001 and said that he had information regarding the weapon used in a recent shooting. *Id.* at 1589. Soto testified that he went to Salazar's house and arrested him for an outstanding warrant related to a traffic violation. *Id.* at 1589-90. Soto testified that Salazar voluntarily provided information about the shooting before Salazar was offered complete immunity in exchange for his testimony. *Id.* at 1590.

Perry Juan Monita, a Patrol Sergeant and gang expert with the Brawley Police Department, testified regarding gang activity in Brawley. (Lodgment 1, Volume 17 at 1789-91, ECF No. 16-17). Monita testified that Jesse Garcia was not a gang member. *Id.* at 1835. Monita testified that Petitioner was involved in a gang-related incident in October 2001, roughly one month after the Jesse Garcia murder, and that Petitioner was convicted of street terrorism as a result. *Id.* at 1822-83. The court instructed Monita not to mention that the street terrorism conviction involved a gang-related shooting. *Id.* at 1818-21. However, Monita inadvertently testified that the police had responded

to the incident in October 2001 after receiving a call on a gang-related shooting. *Id.* at 1818. The court instructed the jurors to disregard Monita's comment about a shooting. *Id.* at 1821-22.

The prosecution recalled Santoyo. Santoyo testified that the January 9, 2008 letter from Petitioner referenced "Kat," a gang moniker for Carlos Landa. *Id.* at 1873-74. Santoyo testified that Petitioner had asked Landa to tell Santoyo not to testify, and that if he Santoyo did testify, he should lie. *Id.* at 1874-76.

### 2. Defense Witnesses

Bianca Garcia, who has three children with Salazar, testified that she lived with Salazar in Brawley from 1994 to 2001, which she described as the worst years of her life. (Lodgment 1, Volume 18 at 1977, 1983, ECF No. 16-18). Garcia testified that she never permitted Petitioner to come to her house. *Id.* at 1981-82. She testified that she was sleeping well during the period of time encompassing the shooting, and that it is possible Petitioner came to her home on the night of the shooting when she was asleep. *Id.* at 1985-89.

Doris Armenta, wife of Petitioner and the mother of Petitioner's two children, testified that she was dating Petitioner in 2001 while she was in high school. *Id.* at 1994, 2013. During Armenta's testimony, the record reflects that Petitioner made "a run for the back gate" of the courtroom, and stated "fuck that fool." *Id.* at 1995. The courtroom deputy stated outside the presence of the jury that Petitioner had attempted to spit on a member of the public. *Id.* at 1996. Counsel for Petitioner stated outside the presence of the jury that Petitioner was upset that Petitioner's wife brought her new boyfriend to court. *Id.* at 1997. When the jury returned, the court told the jury that it appeared Petitioner was upset that his wife's boyfriend was in court, and that Petitioner would not be present during the remainder of her testimony. *Id.* at 2005-06. Armenta testified that she was in Mexicali, Mexico attending a birthday party on the night of the shooting. *Id.* at 2008. Armenta testified that she had called Petitioner at his home and spoken with him at least ten times on the night of the shooting, including past midnight.

*Id.* at 2011.

Agent Soto testified that Hernandez was first forthcoming with the police about the shooting on December 6, 2006. *Id.* at 2077. Soto testified that he had applied for arrest warrants for Petitioner and Gastelum on May 2, 2006. *Id.* at 2088.

Landa testified that he met Petitioner and Santoyo in jail. (Lodgment 1, Volume 19 at 2137, ECF No. 16-19). Landa denied that Petitioner asked him to give Santoyo a message. *Id.* at 2139. Defense counsel asked Landa whether he was afraid of Petitioner. *Id.* at 2141. Landa answered: "What for?" *Id.* at 2142. The prosecutor then asked Landa whether he had ever told Agent Soto that Petitioner "will kill you if you cross him" and that Petitioner "wouldn't hesitate to shoot someone." *Id.* Landa answered "no" over a defense objection. *Id.* During the prosecution's rebuttal case, Agent Somenek was recalled and testified that he and Agent Soto had interviewed Landa on July 3, 2008; a recording of that interview was played for the jury. (Lodgment 1, Volume 23 at 2847-51, ECF No. 16-23). On the recording, a transcript of which is in the record, Landa is heard saying that Petitioner is the type of person who "won't hesitate to shoot you" and if "you cross him he'll kill you." (Lodgment 3, Volume 3, Part 2 at 739, ECF No. 16-35). The court denied Petitioner's mistrial motion based on the prejudicial impact of Landa's statements. (Lodgment 1, Volume 23 at 2857-59, ECF No. 16-23).

Antonio Zamora Fernandez testified that he visited Petitioner's house at about 7:30 p.m. on the night of the shooting. (Lodgment 1, Volume 19 at 2144-47, ECF No. 16-19). Fernandez testified that Petitioner answered the door when he arrived and that Petitioner remained there until Fernandez left at around 9:15 or 9:30. *Id.* at 2147-50.

Lupe Salcido testified that she was with Petitioner at his house on September 15, 2001 from 10:00 p.m. until midnight. *Id.* at 2153-56. Salcido testified that she left for a few minutes and then returned, staying until 1:00 a.m. *Id.* at 2158. Salcido testified that Petitioner was at the house the entire time. *Id.*

Frances Sepulveda Valenzuela testified that she was at home with Petitioner on

the evening of September 15, 2001, and that, to her knowledge, Petitioner did not leave the house that night. *Id.* at 2181-82. Valenzuela testified that Santoyo told her in 2008 that he was implicating Petitioner in the shooting as payback for Petitioner implicating Santoyo in another murder. *Id.* at 2189-90. Valenzuela testified that Santoyo later apologized to her and said that "they are making" him testify against Petitioner. *Id.* at 2192.

### 3.      Verdict and Sentencing

On August 6, 2008, the jury found Petitioner and Gastelum guilty of murder and conspiracy to commit murder. (Lodgment 1, Volume 25 at 3122-23, ECF No. 16-25). The jury made a special circumstances finding that Petitioner had intentionally killed Garcia to further the activities of a criminal street gang. *Id.* at 3122. The jury found that allegation not true as to Gastelum. *Id.* at 3123.

On November 5, 2008, Petitioner was sentenced to twenty-five years to life in prison without the possibility of parole. *Id.* at 3179. Gastelum was sentenced to twenty-five years to life in prison. *Id.* at 3157.

### B.      State Appellate Proceedings

On August 3, 2009, Petitioner appealed his conviction to the California Court of Appeal, raising claims one, four and six presented in this federal Petition, along with a claim challenging the jury's special circumstance finding. (Lodgment No. 5, ECF No. 16-37). On August 30, 2010, the California Court of Appeal affirmed Petitioner's conviction in an unpublished opinion, and denied the claims raised in this Petition on the merits. (Lodgment 8, ECF No. 16-40). The California Court of Appeal granted relief on Petitioner's claim challenging the jury's special circumstance finding, and remanded to the trial court with instructions to re-sentence Petitioner to a term of twenty-five years-to life.[7] *Id.* at 46-58.

On June 1, 2010, Petitioner filed a petition for review in the California Supreme

---

[7]The California Court of Appeal found insufficient evidence was presented at trial to support the special circumstance finding.

Court, raising claims one, four and six presented in this federal Petition. (Lodgment No. 9, ECF No. 16-41). On August 11, 2010, the California Supreme Court summarily denied the petition for review. (Lodgment No. 10, ECF No. 16-42).

On November 1, 2011, Petitioner filed a habeas petition in the California Supreme Court, raising claims two through six presented in this federal Petition. (Lodgment 11, ECF No. 16-43). On April 11, 2012, the California Supreme Court summarily denied the petition. (Lodgment 12, ECF No. 16-44).

## II.    Federal Proceedings

On November 4, 2011, Petitioner filed the Petition for Writ of Habeas Corpus ("Petition") in this Court pursuant to 28 U.S.C. § 2254. (ECF No. 1). In his six claims for relief, Petitioner alleges that his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated because: (1) highly prejudicial character evidence was erroneously introduced at trial; (2) trial counsel rendered ineffective assistance by failing to call a handwriting expert to testify; (3) appellate counsel rendered ineffective assistance by failing to raise claim five presented here on appeal; (4) the trial court failed to excuse two jurors who spoke to the husband of a key prosecution witness during a recess; (5) trial counsel rendered ineffective assistance in failing to request that a juror who was acquainted with the husband of a key prosecution witness be excused; and (6) the jury heard inadmissible evidence regarding Petitioner's conviction for street terrorism. *Id.* at 10-11.

On September 7, 2012, Respondent filed an Answer to the Petition. (ECF No. 22). Respondent contends that federal habeas relief is unavailable because the state court's adjudication of Petitioner's claims involved an objectively reasonable application of clearly established federal law. On October 1, 2012, Petitioner filed a Traverse. (ECF No. 23.)

On January 23, 2013, the Magistrate Judge issued a Report and Recommendation, recommending that the Court deny the Petition in its entirety. (ECF No. 24). On February 1, 2013, Petitioner filed Objections to the Report and Recommendation. (ECF

No. 25).

## STANDARDS OF REVIEW

*Review of the Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)*

The duties of the district court in connection with a Report and Recommendation of a Magistrate Judge are set forth in Federal Rule of Civil Procedure 72(b) and 28 U.S.C. § 636(b)(1). When a party objects to a Report and Recommendation, "[a] judge of the [district] court shall make a de novo determination of those portions of the [Report and Recommendation] to which objection is made." 28 U.S.C. § 636(b)(1). A district court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Fed. R. Civ. P. 72(b); *see also* 28 U.S.C. § 636(b)(1).

*Review of the Petition pursuant to 28 U.S.C. § 2254(d)*

In this case, review of the Petition is governed by the framework of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") because the Petition was filed in 2010, well after the Act's effective date. *See Woodford v. Garceau*, 538 U.S. 202, 210 (2003). As amended by AEDPA, 28 U.S.C. § 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"Although AEDPA's scheme is complex, and its provisions have been subjected to multiple, sometimes conflicting, interpretations, this much is clear: deference to state court determinations must follow an adjudication on the merits." *Lambert v. Blodgett*, 393 F.3d 943, 965 (9th Cir. 2004). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court

adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, — U.S. —, 131 S. Ct. 770, 784-85 (2011); *see also Johnson v. Williams*, 133 S. Ct. 1088, 1097 (2013) (holding that when a state court rejects some claims on the merits but does not expressly address a federal claim, there is a presumption subject to rebuttal that the state court also adjudicated the federal claim on the merits). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)).

Under 28 U.S.C. § 2254(d)(1), a state court decision is "contrary to" clearly established precedent if it "applies a rule that contradicts the governing law set forth in our cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam) (quotation omitted). A decision is an "unreasonable" application if the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Williams*, 529 U.S. at 407-08. "[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.... Rather, that application must be objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citations omitted).

Under 28 U.S.C. § 2254(d)(2), "[f]actual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable -- a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S.

465, 473 (2007).

**DISCUSSION**

**I.     Claims One and Six: Admission of Overly Prejudicial Evidence**

In claim one, Petitioner contends that he was deprived his Fifth, Sixth, Eighth and Fourteenth Amendment rights when the trial court: (1) permitted the prosecutor to ask Landa whether he told a police officer that Petitioner was the type of person who would kill someone who crossed him; and (2) permitted the admission of Landa's recorded statement into evidence, in which Landa is heard stating that Petitioner was the type of person who would kill someone who crossed him and that Petitioner was the type of person who would not hesitate to shoot someone. (Pet. at 10; Pet. Mem. at 26-36). Petitioner contends that the question was designed to elicit unduly prejudicial character evidence, and that the recording introduced such evidence.

In claim six, Petitioner contends that he was denied his Fifth, Sixth and Fourteenth Amendment rights to due process and a fair trial on the basis that highly prejudicial evidence that lacked significant probative value was admitted regarding his previous conviction for street terrorism. (Pet. at 11.)

The California Supreme Court summarily denied Petitioner's petition for review, which raised claims one and six presented in this federal Petition. A summary denial by the state's high court is presumed to be an adjudication "on the merits" within the meaning of AEDPA. *See Harrington*, 131 S. Ct. at 784-85. This Court must "look through" the California Supreme Court's summary denial and review the state court's last reasoned decision on claims one and six, which is the California Court of Appeal's written decision affirming Petitioner's conviction on direct appeal. *See id.*; *Ylst*, 501 U.S. at 803 ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground.").

**A.     Decisions of the California Court of Appeal**

The Court of Appeal rejected claim one, stating in pertinent part:

The prosecutor asked Landa whether he was afraid of Armenta - the implication being that Landa's fear of Armenta may have caused Landa to be less than truthful in his trial testimony. Landa indicated that he was not afraid of Armenta, responding, 'What for?' The prosecutor's questions about whether Landa had made prior statements that suggested otherwise were intended to raise questions about the veracity of Landa's claim at trial that he did not fear Armenta.

'Evidence that a witness ... fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible.' (*People v. Burgener* (2003) 29 Cal.4th 833, 869.) The prosecutor's questions to Landa thus did not run afoul of Evidence Code section 1101's prohibition against admitting character evidence, because the evidence that the prosecutor was attempting to elicit was intended to challenge the credibility of Landa's trial testimony. The trial court did not err in permitting the prosecutor to ask Landa questions about earlier statements he had made that suggested that he was afraid of Armenta, even if those statements involved Landa's opinion about Armenta's character....

We need not determine whether the trial court abused its discretion in admitting in evidence Landa's statements about Armenta's character as someone who would kill if crossed, however, because even assuming that it was an abuse of discretion to allow this statement in evidence, we conclude that the admission of this evidence was harmless in the context of the entire trial.... We conclude that there is no reasonable probability that Armenta would have received a more favorable outcome if the court had required the prosecutor to redact the portion of Landa's recorded statement to Soto in which Landa expressed his view that Armenta was the type of person who would kill if crossed.

...There was substantial evidence of Armenta's guilt, and the jury clearly believed the multiple witnesses who testified against him - all of whom told stories consistent with the others' accounts concerning the nature of Armenta's involvement in this shooting. Although some of the witnesses' testimony may have included inconsistencies, the jury was free to weigh those inconsistencies in the context of each witness's full testimony in determining issues of credibility. We are confident that it is not reasonably probable that Armenta would have received a more favorable result if the trial court had not admitted Landa's tape recorded statement about Armenta's character, even in view of its prejudicial nature.

(Lodgment No. 8, People v. Armenta, D054071, slip op. at 33-38).

The Court of Appeal rejected claim six, stating in pertinent part:

We conclude that the trial court did not abuse its discretion under Evidence Code 352 in allowing the prosecutor to introduce evidence of Armenta's street terrorism conviction. Armenta presented evidence in the form of expert opinion that although he had previously been a member of the Chicali gang, by the time of the shooting in September 2001, he was no longer affiliated with the gang. Evidence that a mere month after the Garcia/Hernandez shooting took place Armenta was not only involved in gang violence, but was convicted as a result of that conduct, specifically rebutted Armenta's contention that he had given up his affiliation with the gang years before the shooting took place.

Armenta asserts that there was abundant other evidence that he was in the Chicali Brasas gang at the time of this shooting, including Monita's testimony that Armenta 'was responsible for forming the Chicali Brasas gang ... and that a source in the gang, Manuel Espinosa, considered [Armenta] a 'prime mover' and 'hardcore member' in 2002 or 2003.' Armenta points out that other witnesses, such as Villa, suggested that Armenta was in the gang at the time of the shooting, and that a probation report from January 2003 stated that he was a 'Chicali 13 member.' However, none of this evidence is similar to the evidence of his conviction for a gang crime. Evidence of the street terrorism conviction was highly relevant, particularly once Armenta elected to introduce his expert's opinion that he had dropped out of the gang.

Further, the trial court ruled that the prosecution would not be allowed to mention the fact that the street terrorism conviction was based on a shooting incident, thereby minimizing the potential that the jury would use the fact of the street terrorism conviction for a purpose other than simply as evidence that Armenta was still involved with the Chicali gang in late 2001, despite his claims to the contrary. The court acted well within its discretion in determining that the probative value of this evidence outweighed any prejudice that might result from its admission....

Armenta contends that even assuming that the trial court did not abuse its discretion in initially deciding to admit evidence of the street terrorism conviction, the court erred in failing to exclude this evidence once Monita referred to the underlying conduct supporting the conviction as a 'shooting,' in violation of the trial court's ruling that the prosecutor and witness were not to discuss the underlying facts of the street terrorism conviction.

Before the prosecutor questioned Monita regarding the prior conviction, the trial court had concluded that evidence that Armenta had committed 'street terrorism ... directed at members of the Broleno gang' would be sufficient to establish that Armenta was still involved with the gang in late 2001, and that it was not necessary to discuss whether the crime involved a shooting. However, when the prosecutor asked Monita about a gang-related incident in October 2001 involving Armenta, Monita began his answer by saying that the police had 'received a call of a shooting.'

It appears clear that the trial court wanted to avoid any mention of the facts underlying the street terrorism charge, and that Monita's response to the prosecutor's question should not have included the nature of the call to which officers responded. Armenta frames the issue as involving 'the revelation that Armenta's prior conviction had involved a gang-related 'shooting,'' which, he contends, 'went directly to the main issue of the case: whether he had conspired with Gastelum to commit the gang-related shooting that had resulted in Garcia's death.' Although Monita should not have mentioned the word 'shooting' in his response to the prosecutor's question, what he said did not equate to a 'revelation that Armenta's prior conviction had involved a gang-related 'shooting.'' Rather, Monita said that officers received a call about a 'shooting.' He was immediately prevented from saying anything further. Monita never testified that a shooting had in fact occurred, or that Armenta's conviction involved a shooting incident. Further, the trial court immediately admonished the jury

that 'the reason [f]or their [i.e., the officers] responding wasn't critical' and told jurors to disregard Monita's statement as to the reason officers responded that day.  As the court told the jury, 'You will find out what happened, what the result of the investigation was. Treat that comment as something that wasn't necessarily proven, that could have been anyone, a number of different things.'

Armenta contends that the trial court's admonition was insufficient and ineffective, and could not have cured the prejudice that resulted from Monita's mentioning a shooting. He cites the following language in *People v. Hardy* (1948) 33 Cal.2d 52, 61 (*Hardy*) in support of this contention:

'It has ... been held that in certain cases where the incompetent evidence goes to the main issue and where the proof of defendant's guilt is not clear and convincing, that the error in admitting the incompetent evidence cannot be cured by striking out and instructing the jury to disregard that evidence.'

*Hardy* was quoting *People v. McKelvey* (1927) 85 Cal. App. 769, 771 - a case in which the trial court allowed five witnesses 'to testify to defendant's bad moral character, although he had not put his character in issue.' (*Hardy*, supra, 33 Cal.2d at p. 62.) In *Hardy*, the evidence being challenged was what the court viewed as 'a confession [by the defendant] for which no foundation had been laid.' (*Id.* at p. 61.) The trial court had allowed a deputy to testify as to what the defendant had said, but then determined that the evidence should not have been admitted because no proper foundation had been laid. However, in instructing the jury that the deputy's testimony 'was expunged from the record' and that it was not to consider that evidence, the court re-read the very same testimony to the jury a second time. (*Ibid.*) Under those circumstances, the *Hardy* court found that 'it was extremely unlikely that the jury could wholly reject the evidence and completely disregard it in their deliberations.' (*Id.* at p. 62.)

The evidence at issue in this case is not of the same type as the erroneously admitted evidence discussed in *Hardy* or *McKelvey*. In addition, the other evidence of Armenta's guilt was significant and convincing. Further, the court in this case provided the jury with a reason why it should ignore Monita's description of the call, telling the jury that it had not been proven and could have been 'a number of things,' and informing them that the reason for the call was irrelevant. This, combined with the court's clear admonition that the jury was to disregard Monita's reference to the type of call that officers had received, sufficiently cured any problem that Monita's description of the call as being one about a shooting may have raised.

(Lodgment No. 8 at 38-46, ECF No. 16-40).

## B.    Recommendation of the Magistrate Judge

The Magistrate Judge recommended that the Court deny claims one and six on the grounds that: (1) no clearly established federal law exists stating that a due process violation can result from improperly admitted propensity evidence; (2) even if clearly

established federal law does exist on this issue, any constitutional error was harmless in light of the other evidence introduced against Petitioner at trial. (ECF No. 24 at 28-31, 53-54).

Petitioner objects to the Magistrate Judge's recommendation to deny claim one because "the evidence at issue rendered the trial fundamentally unfair," constituting a due process violation under clearly established federal law. (ECF No. 25 at 5, 8). Petitioner contends that "the admission of the prejudicial evidence was not harmless, but rather had a substantial and injurious effect on the jury's determination of guilt." *Id.* at 5, 8. Petitioner asserts: "Allowing the jury to hear evidence that Landa said Petitioner would not hesitate to shoot someone and was the type of person who would kill anyone who cross[ed] him was highly inflammatory. Petitioner maintains that the evidence against him was shaky and the character evidence likely filled in the gaps by casting Petitioner as a manipulative person, inclined to kill people who crossed him." *Id.* at 5. Petitioner asserts: "The evidence of a prior felony conviction for street terrorism was highly prejudicial because the prior offense was essentially identical to the allegation in this case. Moreover, despite the fact that the state Court of Appeal found there was insufficient evidence to support the gang allegation, Petitioner maintains that the revelation that he had a prior conviction involving a gang related shooting went directly to the jury's determination of whether he conspired to commit the current gang related shooting." *Id.* at 8.

### C.    Analysis

"[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. *Id.* The court's habeas powers do not allow for the vacatur of a conviction "based on a belief that the trial judge incorrectly interpreted the California Evidence Code in ruling" on the admissibility of evidence. *Id.* at 72; *see also Randolph v. California*, 380 F.3d 1133,

1147 (9th Cir. 2004) ("A violation of state evidence rules is insufficient to constitute a due process violation."); *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991) ("On federal habeas we may only consider whether the petitioner's conviction violated constitutional norms").

In *Jammal*, where the petitioner on federal habeas asserted that certain evidence was improperly admitted against him at his state trial in violation of his right to a fair trial, the Ninth Circuit elaborated on the interplay between state law and federal habeas corpus:

> [W]e note that failure to comply with state rules of evidence is neither a necessary nor sufficient basis for granting habeas relief. While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated; conversely, state procedural and evidentiary rules may countenance processes that do not comport with fundamental fairness. The issue for us, always, is whether the state proceedings satisfied due process; the presence or absence of a state law violation is largely beside the point.

*Jammal*, 926 F.2d at 919-20.

The Magistrate Judge correctly stated that no clearly established federal law exists as to claims one and six because "the Supreme Court in *McGuire* specifically reserved ruling on the issue regarding whether introduction of propensity evidence can give rise to a federal due process violation, and has denied certiorari at least four times on the issue since *McGuire* was decided...." (ECF No. 24 at 28). Because no such clearly established federal law exists, the Court cannot conclude that the California Court of Appeal's decision to deny Petitioner relief from the trial court's evidentiary rulings, even if incorrect under California law, was "contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. 2254(d)(1); *see also McGuire*, 502 U.S. at 67 (rejecting the conclusion that evidence was "incorrectly admitted ... pursuant to California law" as a basis for federal habeas corpus relief).

Even if a trial court's error in admitting overly prejudicial evidence can be so serious as to constitute a violation of due process under clearly established federal law,

the Magistrate Judge correctly stated that a federal habeas petitioner is not entitled to relief from a trial error under clearly established federal law unless the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  The Ninth Circuit has interpreted "substantial or injurious effect" as meaning the petitioner would have received a more favorable result absent the error. *Bains v. Cambra*, 204 F.3d 964, 971 n.2 (9th Cir. 2000).  In  light of the overwhelming evidence elicited against Petitioner at trial, including the testimony of Villa and Salazar that Petitioner asked them to participate in the shooting, the Court finds that Petitioner has failed to adequately demonstrate that the trial court's evidentiary rulings "had substantial and injurious effect or influence in determining the jury's verdict" in this case. *Brecht*, 507 U.S. at 637.  Accordingly, the Court of Appeal's decision to deny claims one and six was neither contrary to, nor an unreasonable application of, clearly established federal law. *Id.* at 14-15.

The Court adopts the recommendation of the Magistrate Judge to deny claims one and six.

## II.   Claims Three, Four and Five: Juror Misconduct and Ineffective Assistance of Counsel

In claim four, Petitioner contends that he was deprived his Fifth, Sixth and Fourteenth Amendment due process rights when the husband of  Mary Vasquez, a witness for the prosecution, conversed with two jurors during a break in the trial.  In claim five, Petitioner contends that he was deprived his Sixth and Fourteenth Amendment right to the effective assistance of counsel because his trial counsel failed to seek removal of the juror who knew the husband of Vasquez.  In claim three, Petitioner contends that he was denied his Sixth and Fourteenth Amendment right to the effective assistance of counsel because his appellate counsel failed to argue on appeal that his trial counsel was ineffective for failing to seek removal of the juror who knew the husband of Vasquez.

Petitioner raised claims three, four, and five in his habeas petition filed before the California Supreme Court. (Lodgment 9). The California Supreme Court summarily denied the petition (Lodgment 10), which is presumed to be an adjudication "on the merits" within the meaning of AEDPA. *See Harrington*, 131 S. Ct. at 784-85. This Court must "look through" the California Supreme Court's summary denial and review the state court's last reasoned decision on claim four, which is the California Court of Appeal's written decision affirming Petitioner's conviction on direct appeal. *See id.*; *Ylst*, 501 U.S. at 803 ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."). No reasoned decision exists as to claims three and five because these claims were not raised in a lower state court. Accordingly, this Court must conduct an independent review of the record as to claims three and five. *See Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002) (holding that when the state court reaches the merits of a claim but provides no reasoning to support its conclusion, "although we independently review the record, we still defer to the state court's ultimate decision."); *Greene v. Lambert*, 288 F.3d 1081, 1089 (9th Cir. 2002) ("[W]hile we are not required to defer to a state court's decision when that court gives us nothing to defer to, we must still focus primarily on Supreme Court cases in deciding whether the state court's resolution of the case constituted an unreasonable application of clearly established federal law.").

As to claim four, alleging juror misconduct, the California Court of Appeal stated:

> Armenta contends that '[j]uror misconduct occurred during the trial when two jurors were introduced to Mary Vasquez, a key prosecution witness, by her husband, and then engaged in friendly conversation with Mr. Vasquez and possibly with his wife as well prior to her testimony.' In the alternative, Armenta contends that the trial court abused its discretion 'by failing to conduct an adequate hearing regarding the contact between the jurors' and the witness and her husband. According to Armenta, the first error deprived him of his right to unbiased jurors, and the second deprived him of his right to an adequate appellate record.

>    1.   *Additional background*

One afternoon during the prosecution's case-in-chief, the trial court took a recess for approximately 10 minutes. Upon returning to the courtroom, outside the presence of the jury, the prosecutor informed the trial court that Armenta's attorney had indicated to the prosecutor that he believed he had seen a prosecution witness, Mary Vasquez, 'conversing with two jurors.' The prosecutor told the court that she 'immediately went out . . . to stop it.' Vasquez informed the prosecutor that she had not spoken with any jury members, but that her husband had spoken with two jurors.

The trial court stated, 'We're going to have to inquire and clear this up.' The court proceeded to question each of the two jurors separately. The court engaged in the following colloquy with Juror 1:

THE COURT: . . . I had some information that you were talking to an individual outside just a few minutes ago wearing your juror badge.

JUROR NUMBER 1: Yes.

THE COURT: Did they approach you, sir?

JUROR NUMBER 1: Yeah. He told me he['d] seen me someplace before and couldn't remember.

THE COURT: And?

JUROR NUMBER 1: I didn't remember him.

THE COURT: Okay. Was there anything else that he told you?

JUROR NUMBER 1: No.

THE COURT: Did anybody else talk to you?

JUROR NUMBER 1: No. Just the gentlemen there.

THE COURT: Okay. And that is all that he discussed with you?

JUROR NUMBER 1: He said he['d] seen me someplace before. I told him where I work at. He said, okay. That's where he saw me. He used to bring dogs down there from the City.

THE COURT: So you talked a little bit about that?

JUROR NUMBER 1: That was it.

THE COURT: I mean, you mentioned where you worked, how you might have seen him before?

JUROR NUMBER 1: He might have seen me.

THE COURT: Anything else?

JUROR NUMBER 1: That's it.

After this exchange, the court permitted defense counsel to question Juror 1. Defense counsel asked Juror 1 if a lady sitting on the steps had conversed with him at all, to which Juror 1 answered 'No.' The court admonished Juror 1: 'Don't talk to anybody about the case. Don't talk to witnesses, et cetera.'

The court then called Juror 2 to the sidebar conference and engaged in the following colloquy with Juror 2:

THE COURT: . . . [W]hen we were on our break, you were seen talking to some individuals outside.

JUROR NUMBER 2: Yeah.

THE COURT: Do you remember?

JUROR NUMBER 2: I know who I was talking to. I know the guy. I guess he is married to one of the witnesses. I didn't know.

THE COURT: One of the witnesses is married to-

JUROR NUMBER 2: To my friend.

THE COURT: To the one you were talking to. How long a conversation did you have?

JUROR NUMBER 2: Just hi and just asking me what I had. I said I was on jury duty.

THE COURT: Did he ask you any questions?

JUROR NUMBER 2: No.

THE COURT: Did you ask him any questions?

JUROR NUMBER 2: No. He just said he was there with his wife. She was there for a case, that she was there for a case or something. I don't know what it was.

THE COURT: He didn't ask you anything about the case?

JUROR NUMBER 2: No. Nothing.

"THE COURT: And you didn't tell him anything about the case?

JUROR NUMBER 2: Huh-uh.

THE COURT: Remember the admonition not to talk to anybody . . . about the case?

JUROR NUMBER 2: I just saw him and went, hi.

...

THE COURT: That's all we're doing right now, checking to

make sure that no one is trying to talk to you about the case, you are not talking about the case.  Just making sure.  You did exactly what you are supposed to.

The court then asked defense counsel if he wished to question the juror. Defense counsel asked Juror 2 if the lady seated on the steps had spoken to him. Juror 2 responded, 'No.  She just spoke to her husband.  I don't know her.' Defense counsel then asked which one of the two, 'wife or husband,' had approached him.  Juror 2 said that the man had approached him to shake his hand because they know each other.  Juror 2 stated that he knew the man from '[p]laying basketball,' and that the man 'works in our city, ... Brawley [C]ity.' When asked if he had told the man that he was a juror on a case, Juror 2 said that the man had asked him what he was doing there, and Juror 2 responded that he was on jury duty.  The man did not say anything in response to Juror 2's statement that he was on jury duty, but instead 'just talked to his wife' in Spanish.

The court stated, 'It seems to me that it's okay,' but resolved to talk to Vasquez's husband to 'caution him.'  The court said that what had occurred 'was harmless,' but that the court did not 'want this to happen again.'  The bailiff was unable to locate Vasquez's husband that day.  The prosecutor informed the court that Vasquez and her husband may have left because Vasquez had been told that she would not be called as a witness that day.

Several days later, defense counsel returned to this issue.  Defense counsel stated:

I would just like to say, Your Honor, when I looked out there, I saw the two witnesses, I think it was [Juror No. 1] and the young man who I think is [Juror No. 2].  The husband of Mary Vasquez was extending his hand out to shake the hand of those two individuals.

He then introduced his wife, Mary Vasquez, to at least the young man, [Juror No. 2].  I think it was obvious to the witness, Mary Vasquez, and her husband that this was the department that they were going to be testifying in.  And they went out of their way to make contact with jurors that were going to hear her testimony.

I think that was a violation of 1122 of the Penal Code, which is the admonishment section, not in the sense that the jurors violated that section, but I believe it was the intent of the witness here to ingratiate herself through her husband with jurors....

Defense counsel contended that Vasquez had committed misconduct, and that the court either should sanction the prosecution by barring Vasquez from testifying, or should 'giv[e] some type of admonishment to the jury that that was an improper contact by the witness and that under no circumstances should that witness have attempted to contact them.'  The prosecutor argued that defense counsel was now claiming that something different had occurred than what defense counsel had originally represented.  The trial court stated:

But, you know, the jurors, those two particular jurors were questioned and admonished. And then I repeated the instruction to the other jurors. I think I underlined once again what they were to do with respect to people attempting to talk to them about the case. In this particular situation, there was no discussion about the case at all. Apparently one or two of the jurors knew the husband who is, of course - his name wasn't mentioned when we inquired as to whether they knew the witnesses or not.

It wasn't necessarily the witness that attempted to directly ingratiate herself with the jurors. I don't know what the husband had in mind. That's one thing that I intended to discuss with him. He hasn't been available up to this point. Before she testifies, I certainly would want to inquire further. I suspect he will be there.

In any event, I don't know that at this point I would bar Ms. Vasquez from testifying on the information that we have, the information we got from the jurors who were directly involved in this contact. At most I would think that perhaps inquiring a little bit further with the husband might produce some kind of information, but I think that as it stands now I don't feel it's necessary to take any steps against Ms. Vasquez at this time. I don't think that would be necessary.

I think that if she does take the stand and testifie[s] that, you know, under cross-examination a lot of questions could be posed to her which might clarify this as well. At this point, I don't think that any further action from the Court is required. I would, though, as I indicated, like to speak to the husband to inquire. Although I don't even think that is necessary, absolutely necessary, but I think it would perhaps help things.

The following day, defense counsel again raised the issue. Defense counsel suggested that Vasquez's husband may have contacted all of the jurors, and asked that the court inquire of the entire jury to determine whether any other contact had occurred. The court responded, 'I'm going to make a general inquiry about this just to make sure that nothing has happened because, again, if you are correct, Mr. Breeze, the Court wants to know about this and I will make an inquiry. I don't think, again, with respect to Mr. Vasquez'[s] approach of the jurors, I don't know that that can really be attributed to Mrs. Vasquez. I will inquire about the other jurors.'

As soon as the prosecutor called Vasquez to testify, the trial court said to the jury:

Ladies and gentlemen, last week I had occasion to talk to two jurors about possible, you know, discussion with people that were witnesses or related to witnesses. And I would inquire at this time, just out of an abundance of caution, have any others of you been approached by anybody wanting to discuss this case or anybody that you maybe identified as a relative of a witness or something of that nature?

The trial court received no response from any of the jurors.  The court then reiterated its admonishment to the jury:

> Remember every time you leave, I remind you not to talk to the people at the counsel table, witnesses about the case. And, again, many times any contacts are relatively harmless, but if someone sees you talking to someone, it could be misconstrued. So please, be very careful. When you are walking through the courthouse, be sure you keep your juror badge on.  Even outside the environment of the Court, be very careful.  Of course, remember not to read about the case in the newspapers or any other media of any kind.  Please keep that in mind.

Defense counsel did not cross-examine Vasquez regarding the incident involving her husband and the two jurors.

### 2.    *There was no juror misconduct*

Armenta contends that 'juror misconduct occurred when the two jurors spoke to Mr. Vasquez, who introduced one or both of the jurors to his wife, Mary Vasquez, a key prosecution witness.'  The record does not support Armenta's description of what occurred, or his conclusion that what occurred amounts to juror misconduct.

In general, juror misconduct occurs when there is a direct violation of the juror's oaths, duties, and instructions.  (*In re Hamilton* (1999) 20 Cal.4th 273, 294; see also § 1122, subd. (b).)  Under section 1122, subdivision (b), jurors commit misconduct when they 'converse among themselves, or with anyone else, on any subject connected with the trial, or ... form or express any opinion thereon before the cause is finally submitted to them.'

Armenta maintains that 'the two jurors spoke to Mr. Vasquez, who introduced one or both of the jurors to his wife, Mary Vasquez.'  Armenta later describes the encounter in the following manner: 'Here, Mary Vasquez accompanied her husband as he spoke to the two jurors. Also, he apparently introduced one or both of them to her, and she shook hands with them.'  Armenta contends that 'the amiable contact between the jurors and a key prosecution witness amounts to juror misconduct.' However, the record reflects that Mary Vasquez had no contact at all with jurors.

Both jurors were asked whether they had spoken with Mary Vasquez, and both jurors said that they had not.  Although defense counsel claimed to have seen the witness's husband introduce her to the two jurors, the juror's responses to the court's questions and defense counsel's question contradict this claim.  Both jurors very clearly denied having had any contact with Mary Vasquez.

Although the fact that Mary Vasquez's husband contacted two jurors is unfortunate, the husband was not a witness in the case and the jurors did not talk with him about the case.  The jurors' brief interactions with the husband did not violate the instructions that the jurors had been given, and is not akin to the direct juror-witness conversations that were found to constitute juror misconduct in *People v. Ryner* (1985) 164

Cal.App.3d 1075 (*Ryner*), a case on which Armenta heavily relies.

In *Ryner*, seven jurors engaged in a hallway conversation with a police officer who was a prosecution witness, during a morning recess. The jurors and officer did not discuss the case or the officer's testimony, but rather, talked about sports and the officer's experiences on the police force and in the military. (*Ryner*, *supra*, 164 Cal.App.3d at pp. 1080-1081.) The *Ryner* court concluded that this conversation constituted juror misconduct. [Footnote 8].

> FN8. The *Ryner* court ultimately determined that although the conversation between the jurors and the prosecution witness was misconduct, it was 'so brief and innocuous that we regard it as trivial misconduct,' and not prejudicial. (*Ryner*, *supra*, 164 Cal. App.3d at p. 1083.)

(*Id.* at p. 1083.)  What occurred here is not like what occurred in *Ryner*. The two jurors in question in this case did not have contact or a conversation with a prosecution witness.   Contrary to Armenta's contention, there is no evidence that 'Vasquez had ingratiated herself to the jurors.'  We reject his assertion that juror misconduct occurred.

3. *The trial court's inquiry into what occurred between the jurors, the witness, and the witness's husband was sufficient*

Armenta contends, in the alternative, that the trial court abused its discretion in not inquiring further into whether there was any contact between Mary Vasquez and the two jurors.  Specifically, Armenta claims that '[t]he court abused its discretion by failing to conduct a thorough inquiry once it learned that potential misconduct had occurred and thereby [failing to] determine fully the facts surrounding the interaction between Vasquez and the jurors.'  Armenta suggests that the trial court should have conducted a hearing pursuant to section 1120 regarding defense counsel's claim that he witnessed Mary Vasquez engaging with the jurors.  Section 1120 provides:

> If a juror has any personal knowledge respecting a fact in controversy in a cause, he must declare the same in open court during the trial.  If, during the retirement of the jury, a juror declares a fact which could be evidence in the cause, as of his own knowledge, the jury must return into court.  In either of these cases, the juror making the statement must be sworn as a witness and examined in the presence of the parties in order that the court may determine whether good cause exists for his discharge as a juror.

Armenta concedes that in this case, there is nothing that would indicate that any of the jurors possessed personal knowledge about the case, and that section 1120 does not specifically apply.   However, Armenta relies on *People v. Burgener* (1986) 41 Cal.3d 505 (*Burgener*) overruled on other grounds in *People v. Reyes* (1998) 19 Cal.4th 743, 753-754, in which the Supreme Court ruled, '[O]nce the court is put on notice of the possibility a juror is subject to improper influences it is the court's duty to make whatever inquiry is reasonably necessary to determine if the juror should be discharged and failure to make this inquiry must be regarded as error.'  (*Id.* at p. 520.)  In *Burgener*, the jury

foreman advised the trial court that one of the jurors appeared to be intoxicated during jury deliberations. (*Id.* at p. 519.) Because the trial court had the discretion under section 1123 to discharge a juror who was unable to perform his or her duty, the court also possessed the discretion to hold a hearing to 'determine whether good cause to discharge the juror exists.' (*Id.* at pp. 519-520.) A court that fails 'to conduct a hearing sufficient to determine whether good cause to discharge the juror exists' abuses its discretion. (*Id.* at p. 520.)

Armenta complains that the procedure that the trial court utilized was inadequate because, although the court 'did ask both jurors to relate what had transpired,' the court 'did not require either juror to testify under oath'; did not 'ask the bailiff to relate what he had witnessed about the interaction, even though the officer acknowledged being 'out there when the whole thing with the jurors went down''; and did not 'inquire of either Mr. Vasquez or the witness herself, Mary Vasquez, and hear their account of the event.' He complains that '[u]nder these circumstances, the court failed to make sufficient inquiry to determine the extent and nature of the contact between the jurors and Mr. and Mrs. Vasquez.'

There is no support in the record or in the case law for Armenta's contention that the trial court was required to conduct a formal hearing, or that the court's inquiry was insufficient. 'A court on notice of the possibility of juror misconduct must undertake an inquiry sufficient 'to determine if the juror should be discharged and whether the impartiality of other jurors had been affected.'' (*People v. Espinoza* (1992) 3 Cal.4th 806, 822.) 'While a hearing with sworn testimony by the juror is required by section 1120, it appears that a less formal inquiry is adequate to determine 'good cause' to discharge a juror under other circumstances.' (*People v. McNeal* (1979) 90 Cal.App.3d 830, 837.)

In this case, the trial court's inquiry was sufficient for the court to determine that the jurors had not engaged in misconduct. Although the jurors were not officially sworn before the court questioned them, the court had no reason to distrust what the jurors said in response to direct questioning. The court had the opportunity to see the jurors and to judge their credibility. Based on this inquiry, the court determined that no misconduct had occurred. Under these circumstances, no additional inquiry was necessary.

Although Armenta complains that the trial court did not inquire of Mary Vasquez to get her version of what had occurred, the trial court clearly contemplated allowing defense counsel to question Vasquez about the incident during cross-examination, when she would have been under oath. The court gave defense counsel the opportunity to further explore 'the nature of the contact between the jurors and Mr. and Mrs. Vasquez,' but counsel apparently chose not to ask Vasquez about the incident involving the jurors on cross-examination. The trial court did not abuse its discretion by proceeding in this manner.

(Lodgment No. 8 at 12-24, ECF No. 16-40).

## A.    Claim Four: Juror Misconduct

The Magistrate Judge recommended denying claim four because "Petitioner has

failed to demonstrate that the state court's findings of no bias was objectively unreasonable." (ECF No. 24 at 45). Petitioner objects to the recommendation of the Magistrate Judge on the following grounds:

> [W]hile the jurors denied speaking directly to Vasquez, their friendly conversation with her husband, may well have caused them to afford greater credibility to her. Contrary to the Magistrate's characterization, Vasquez was not simply an ancillary witness. Vasquez was critical for the prosecution as she was the only witness without a criminal record who placed Petitioner at or near the scene of the shooting....
>
> Petitioner maintains that he was denied due process and equal protection by the failure to conduct a proper inquiry and furnish a record to permit adequate and effective appellant review regarding whether there was any bias. Without additional information about the extent of the relationship between the juror and Vasquez' husband, it is speculative to assume that there was no bias.

(ECF No. 25 at 7).

Clearly established federal law provides that: "The Sixth Amendment guarantees criminal defendants a verdict by impartial, indifferent jurors." *Estrada v. Scribner*, 512 F.3d 1227, 1239 (9th Cir. 2008) (citing *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984); *Smith v. Phillips*, 455 U.S. 209, 217 (1982)). Bias can be "actual bias," which is "the existence of a state of mind that leads to an inference that the person will not act with entire impartiality," or "implied bias," where, in extraordinary cases, bias may be presumed from the surrounding circumstances. *Estrada*, 512 F.3d at 1240. The presence of a biased juror is structural error not subject to harmless error analysis. *Id.*

The Magistrate Judge correctly stated that "[t]here is no evidence in the record demonstrating that either juror lost the ability to be impartial simply by speaking briefly to the husband of a witness regarding matters unrelated to the trial." (ECF No. 24 at 44). The Magistrate Judge correctly explained that "Mary Vasquez was an ancillary witness who merely testified that she saw Petitioner earlier in the day near the house where the shooting later took place, that she knew Petitioner as a member of a gang rival to the gang on whose territory the shooting took place, and that she gave victim Hernandez a ride after he had been shot but was unaware that he was wounded at the

time she gave him a ride." *Id.* The Magistrate Judge correctly stated: "The record indicates that the contact amounted only to an innocuous, chance conversation unrelated to the trial, and Petitioner has established no basis to support his contention that additional inquiry was necessary in order to determine if the jurors were biased in favor of the witness." *Id.* at 45.

"The determination of whether a juror is actually biased is a question of fact, and thus accorded deference under 28 U.S.C. § 2254." *Estrada*, 512 F.3d at 1240. The Magistrate Judge correctly concluded that "Petitioner has failed to demonstrate that the state court's finding of no bias was objectively unreasonable." (ECF No. 24 at 45). The Magistrate Judge correctly concluded that the California Court of Appeal's decision to deny claim four did not involve an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. *See Estrada*, 512 F.3d at 1240; *Miller-El*, 537 U.S. at 340.

The Court adopts the recommendation of the Magistrate Judge to deny claim four.

### B.    Claims Three and Five: Ineffective Assistance of Counsel

In claim five, Petitioner contends that he was deprived his Sixth and Fourteenth Amendment right to the effective assistance of counsel because his trial counsel failed to seek removal of the juror who knew the husband of Vasquez.

The Magistrate Judge recommended that the Court deny claim five because "the record does not support a finding that Petitioner's counsel was deficient in failing to inquire of the juror or in failing to request his dismissal. Petitioner has failed to make a showing of deficient performance or prejudice, either here or in the state court." (ECF No. 24 at 46).

Petitioner objects to the Magistrate Judge's conclusion that "Petitioner's contention that his counsel should have requested the removal of the juror based on the fact that the juror was a friend of the husband, is unsupported." (ECF No. 25 at 7).

Petitioner contends that "the Magistrate ignores the fact that the reason Petitioner's claim is unsupported with hard facts is because counsel was ineffective by failing to make the proper inquiries." *Id.*

For ineffective assistance of counsel to provide a basis for habeas relief, Petitioner must demonstrate two things. First, he must show that counsel's performance was deficient. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed to the defendant by the Sixth Amendment." *Id.* Second, he must show that counsel's deficient performance prejudiced the defense. *Id.* This requires showing that counsel's errors were so serious that they deprived Petitioner "of a fair trial, a trial whose result is reliable." *Id.* The standards under both *Strickland* and section 2254(d) are highly deferential, and they become "doubly deferential" when *Strickland* and section 2254(d) apply "in tandem." *Harrington*, 131 S. Ct at 788. Federal habeas courts approach an ineffective assistance of counsel claim with the "strong presumption" that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Cullen v. Pinholster*, 131 S. Ct. 1488, 1403 (2011).

The Magistrate Judge correctly stated: "Although Petitioner contends his counsel should have requested removal of the juror based on the fact that the juror was friends with the husband of the prosecution witness, Petitioner does not support that contention." (ECF No. 24 at 46). "Counsel's attention to certain issues to the exclusion of others [is presumed to] reflect[] trial tactics rather than 'sheer neglect.'" *Harrington*, 131 S. Ct. at 790 (quoting *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (per curiam)). "[T]he question is not whether counsel's actions were reasonable," but rather, "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* at 788. Based on this record, and pursuant to the "doubly deferential" standard of review required under *Strickland* and § 2254(d), the Court concludes that the decision of the California Supreme Court to deny claim five was neither contrary

to, nor an unreasonable application of, clearly established federal law.

In claim three, Petitioner contends that his appellate counsel was ineffective for failing to raise claim five of the Petition on direct appeal.  In light of the Court's decision as to claim five, discussed above, the Court concludes that the decision of the California Supreme Court to deny claim three was neither contrary to, nor an unreasonable application of, clearly established federal law.

The Court adopts the recommendation of the Magistrate Judge to deny claims three and five.

## III.    Claim Two: Handwriting expert

In claim two, Petitioner contends that he was denied his Sixth and Fourteenth Amendment right to the effective assistance of counsel because his trial counsel failed to call a handwriting expert to testify who had been retained by the defense and had concluded that Agent Soto wrote the two letters which Villa testified he had written and sent to the FBI.

Petitioner raised claim two in his habeas corpus petition filed before the California Supreme Court.  (Lodgment 11 at 29-40, ECF No. 16-43).  The California Supreme Court summarily denied the petition, which is presumed to be an adjudication "on the merits" within the meaning of AEDPA.  *See Harrington*, 131 S. Ct. at 784-85. No reasoned decision exists as to claim two because this claim was not raised in a lower state court.  Accordingly, this Court must independently review the record to determine whether Petitioner is entitled to relief.  *See Pirtle*, 313 F.3d at 1167; *Lambert*, 288 F.3d at 1089.

In his habeas petition before the California Supreme Court, Petitioner asserted that two handwriting experts, Curtis Baggett and Manuel Gonzales, were designated by his trial counsel and appointed by the court, and that Baggett wrote a report concluding that Agent Soto had written the letters that Villa claimed he had authored and sent to the FBI.  (Lodgment No. 11 at 31-32, ECF No. 16-43).  Neither Baggett nor Gonzales was called to testify at Petitioner's trial.  Petitioner submits copies of the Villa letters

and samples of Soto's signature which Baggett relied upon to determine that Soto wrote the letters (ECF Nos. 2-12 to 2-26), as well as a copy of Baggett's report.  (ECF No. 2-18 at 3).

Based on this record, the Court finds that Petitioner has failed to "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  *Turner v. Calderon*, 281 F.3d 851, 876 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 491).  The Magistrate Judge correctly stated:

> Villa had already provided conflicting testimony regarding the letters.  As Petitioner points out, at first Villa said he wrote them both, then said he had help writing the English version of the letter, and explained that because he signed the letter and dictated its contents he considered it his letter whether he physically wrote it or not.  Villa also impeached his own credibility by admitting to a federal conviction for bringing cocaine into the country, membership in a street gang, and drug use, and his girlfriend testified that he made his living selling drugs.  Presenting expert evidence that Soto rather than Villa had written the letters would have had little additional impeachment value.  It might even have had a negative impact if the prosecutor had presented expert evidence that Villa had written the letters.  Petitioner retained two experts and apparently only one was willing to testify that Soto wrote the letters, indicating the possibility that another expert might testify conversely.  The only example of Soto's writing which Baggett used to compare Soto's writing with Villa's were samples of Soto's signature, and there is no indication in the record whether Baggett would have been a persuasive or effective witness.

(ECF No. 24 at 34-35).  The Magistrate Judge correctly stated that "the state supreme court may have reasonably found that Petitioner had failed to demonstrate that counsel's decision not to call Baggett as a trial witness was a tactical one."  *Id.* at 34 (citing *Strickland*, 466 U.S. at 491); *see Turner*, 281 F.3d at 876.

Even if Petitioner was able to demonstrate deficient performance pursuant to *Strickland*, Petitioner has failed to adequately demonstrate that he was prejudiced by his counsel's failure to call the handwriting expert.  The Magistrate Judge correctly stated: "Hernandez provided direct eyewitness evidence that Gastelum was the shooter.  Villa merely placed Petitioner with Gastelum at the time of the shooting and provided cumulative evidence that Petitioner had participated in the shooting.  Other witnesses also provided evidence of Petitioner's involvement, including Petitioner's fellow gang members Santoyo and Salazar, and Petitioner himself through his admissions."  (ECF

No. 24 at 36).   The Magistrate Judge correctly concluded that, "[i]n light of the evidence against Petitioner provided by his fellow gang members detailed above with respect to his first claim, and in light of Petitioner's own admissions, the failure of Petitioner's counsel to call Baggett to testify that in his opinion Soto wrote the Villa letters, thereby implying that he manipulated Villa's testimony, could not be an error so severe as to demonstrate 'a probability sufficient to undermine confidence in the outcome.'"  *Id.* (quoting *Strickland*, 466 U.S. at 495).

The Court concludes that the decision of the California Supreme Court to deny claim two was neither contrary to, nor an unreasonable application of, clearly established federal law.  The Court adopts the recommendation of the Magistrate Judge to deny claim two of the Petition.

## CERTIFICATE OF APPEALABILITY

A certificate of appealability must be obtained by a petitioner in order to pursue an appeal from a final order in a Section 2254 habeas corpus proceeding.  *See* 28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b).  Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  It must appear that reasonable jurists could find the district court's assessment of the petitioner's constitutional claims debatable or wrong.  *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000).  The Court concludes that jurists of reason could not find it debatable whether this Court was correct in denying the Petition.  A certificate of appealability is denied.

//

//

1

2                                  **CONCLUSION**

3            IT IS HEREBY ORDERED that the Report and Recommendation (ECF No. 24)

4    is **ADOPTED** in its entirety.  The Petition for Writ of Habeas Corpus (ECF No. 1) is

5    **DENIED**.  A certificate of appealability is **DENIED**.

6    DATED:  October 18, 2013

7

8                                  **WILLIAM Q. HAYES**
                                   United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28